Bob MOZERT, et al.

v.

HAWKINS COUNTY PUBLIC
SCHOOLS, et al.

(Dr. Robert McElrath, Commissioner of
Education of the State of Tennessee,
Intervening Defendant).

Civ. No. 2–83–401.

United States District Court,
E.D. Tennessee,
Northeastern Division.

Oct. 24, 1986.

Michael P. Farris, Cimron Campbell, Joy P. Jowdy and Jordan Lorence, Washington, D.C. also Larry E. Parrish and Fred McDonald, Memphis, Tenn., for plaintiffs.

W.J. Michael Cody, Atty. Gen. and Reporter, William H. Farmer, Advocate Gen., Michael W. Catalano, Deputy Atty. Gen., Charles Hampton White, Nashville, Tenn., Philip L. Boyd, Rogersville, Tenn., Timothy B. Dyk, Wilmer Cutler & Pickering, Washington, D.C., and N.R. Coleman, Jr. and Ronald W. Woods, Greeneville, Tenn., for defendants.

## MEMORANDUM OPINION

HULL, Chief Judge.

This is a civil rights action, 42 U.S.C. § 1983, seeking injunctive relief and money damages for the alleged violation of the plaintiffs' First Amendment right to the free exercise of religion. This controversy stems from the compulsory use of the 1983 edition of the Holt, Rhinehart and Winston basic reading series (Holt series) in the Hawkins County Public Schools. The plaintiffs, "fundamentalist" Christian school children and their parents, claim that their religion requires that they not be exposed to the Holt series because its contents are offensive to their religious beliefs. The relief sought by plaintiffs includes money damages for the expenses incurred in sending their children to private school and an order of the Court requiring the school system to accommodate their religious beliefs by providing alternative reading instruction.

It is important to note at the outset that the plaintiffs are not requesting that the Holt series be banned from the classroom, nor are they seeking to expunge the theory of evolution from the public school curriculum. Despite considerable fanfare in the press billing this action as "Scopes II", it bears little relation to the famous "monkey trial" of 1925. These plaintiffs simply claim that they should not be forced to choose between reading books that offend their religious beliefs and foregoing a free public education.

The defendants, including intervening defendant, Dr. Robert McElrath, Commissioner of Education for the State of Tennessee, take the position that broad state interests preclude the fashioning of educational alternatives for the plaintiffs. They contend that any attempt to provide acceptable textbooks for the plaintiffs would violate the Establishment Clause of the First Amendment through excessive state entanglement with religion.

This action juxtaposes two of our most essential constitutional liberties—the right of free exercise of religion and the right to be free from a religion established by the state. Moreover, it implicates an important state interest in the education of our children. The education of our citizens is essential to prepare them for effective and intelligent participation in our political system and is essential to the preservation of our freedom and independence. *See, Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

## I.

### BACKGROUND

In January 1983, pursuant to state law,[1] a textbook selection committee was appointed by the Hawkins County school district to select a basic reading series to be used from kindergarten through the eighth grade. After evaluating several series of textbooks over a number of months, the committee recommended purchase of the Holt series. This recommendation was unanimously approved by the Hawkins County Board of Education (Board) at its regular meeting on May 12, 1983. The books were purchased, and the Hawkins County schools began using them at the start of the 1983 school year.

Before the first month of school passed, however, plaintiff Vicki Frost, who had three children attending the Hawkins County public schools, discovered that the sixth grade reading textbook contained material that offended her family's religious beliefs. Mrs. Frost and a friend, Jennie Wilson,[2] organized a meeting which was held September 1, 1983, at the Church Hill Middle School. At this meeting, which was attended by two Hawkins County school principals, Mrs. Frost, Mrs. Wilson and others objected to the sixth grade reading textbook.

In September 1983, a group of Hawkins County residents, including most of the plaintiff-parents, formed an organization named Citizens Organized for Better Schools (COBS). Members of COBS spoke at regularly scheduled school board meetings on September 8, October 13, and November 10, 1983, objecting, among other things, to the use of the Holt series. The COBS members apprised the Board that they found the Holt series offensive to their religious beliefs and presented petitions requesting removal of the Holt series from the schools.

At various times during the Fall of 1983, six plaintiff-families[3] contacted Mr. Salley, principal of Church Hill Middle School, and requested that their children be provided with alternative reading arrangements. Principal Salley apparently acceded to the requests, and seven plaintiff-students at Church Hill Middle School were provided alternative reading arrangements.[4] Two other plaintiff-students were provided alternative arrangements at two separate elementary schools in the district.[5]

The Meades and the Bakers, two other plaintiff-families, sought alternative reading arrangements for their children at Carter's Valley Elementary School. Principal MacMillan refused a proposal for an alternative text, and no alternative arrangements were allowed.

Despite presentations by two plaintiff-parents, the Board unanimously adopted, without discussion, a resolution requiring teachers to "use only textbooks adopted by the Board of Education as regular classroom textbooks"[6] at the November 10, 1983, school board meeting. In compliance with this resolution, school officials at Church Hill Middle School told seven of the student-plaintiffs that they would no longer be allowed to use an alternative reader. At that point, these students refused, on religious grounds, to read the Holt series or to attend the reading classes in which the Holt series was used. They were suspended from school for three days as a result. On November 22, 1983, they were again suspended, this time for ten (10) days, because they continued to refuse to attend reading class and/or read the Holt

1. T.C.A. § 49–6–2207.

2. Mrs. Wilson is apparently the grandmother of plaintiffs Heather and Vicky Baker.

3. The Frosts, Mozerts, Whitakers, Eatons, Couches and Marshalls.

4. The arrangements varied from child to child. Usually the teacher would assign a passage from another reader, and the student would go to another room to read.

5. Sarah Frost at Church Hill Elementary School and Samuel Couch at Mr. Carmel Elementary School.

6. Joint Stipulation of Fact (Court File No. 205 at ¶ 44).

books.[7] Following this rigorous enforcement of the Board's mandate, many of the student-plaintiffs withdrew from public schools and enrolled in private, Christian schools.

Plaintiffs filed this suit on December 2, 1983. On March 15, 1984, this Court granted summary judgment in favor of defendants. This Court found that the plaintiffs' religious beliefs were sincere and that certain passages in the Holt series might be offensive to them, but that, because the books appeared neutral on the subject of religion, they did not violate the plaintiffs' constitutional rights. *Mozert v. Hawkins County Public Schools*, 582 F.Supp. 201, 202 (E.D.Tenn.1984), *rev'd*, 765 F.2d 75 (6th Cir.1985).

The Sixth Circuit reversed this finding and remanded, instructing this Court to determine whether the defendants infringed on the plaintiffs' free exercise rights, whether a compelling state interest would justify such infringement if any, and whether a less restrictive means could accommodate both plaintiffs and defendants without running afoul of the Establishment Clause. *Mozert v. Hawkins County Public Schools*, 765 F.2d at 78 (6th Cir.1985).

With the agreement of the parties, the Court determined that the issue of liability should be decided by the Court without intervention of a jury and that the issue of damages would be tried by a jury at a later date if necessary. The hearing on the issue of liability began on July 14, 1986. Based upon the evidence and testimony offered at trial, and the record as a whole, the Court makes the findings of fact and conclusions of law which follow.

## II.

### BURDEN

"When deciding a free exercise claim, the courts apply a two-step analysis. First, it must be determined whether the govern-

ment action does, in fact, create a burden on the litigant's exercise of his religion. If such a burden is found, it must then be balanced against the governmental interest, with the government being required to show a compelling reason for its action." *Mozert*, 765 F.2d at 78. In addition, it must be determined whether the state has acted in a way which constitutes "the least restrictive means of achieving [the] compelling state interest," as measured by its impact upon the plaintiffs. *Thomas v. Review Board*, 450 U.S. 707, 718, 701 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).

The plaintiffs assert the free exercise rights of both the students and the parents, who assert that their religion compels them not to allow their children to be exposed to the Holt series. Plaintiffs have also alleged that the Board's policy interferes with the inherent right of the parents to "direct the upbringing and education of children under their control...." *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925), *see also, Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

■ In deciding whether plaintiffs' free exercise rights have been impermissibly burdened by the state, the Court must first determine whether the beliefs are religious and whether they are sincerely held by the individual asserting them. "[T]o have the protection of the Religion Clauses the [plaintiffs'] claims must be rooted in religious belief," *Yoder*, at 215, 92 S.Ct. at 1533; and, although the truth of a belief "is not open to question, there remains the significant question whether it is 'truly held.'" *U.S. v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965).

■ Fortunately for the Court, these subtle threshold determinations were made prior to trial. The parties stipulated both that the plaintiffs' beliefs were religious and that they were sincerely held. Joint Stipulation 9. However, before the Court

---

7. On December 8, student-plaintiffs then Gina Marshall and student-plaintiff Travis Mozert were suspended a third time, for an additional ten (10) days. Gina Marshall was allowed to return to school before the third suspension period ended and was not required to read the Holt series.

may turn to the issue of whether the exercise of these beliefs is burdened by the Board's requirement that all students read from the Holt series, the defendants would have the Court decide whether these beliefs are central to the plaintiffs' faith. The defendants argue that unless the beliefs are central to the plaintiffs' faith, they are not entitled to protection under the Free Exercise Clause of the First Amendment.

In making this assertion, the defendants rely on certain language in *Yoder, supra,* in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and also on two Sixth Circuit cases. *Lakewood Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303 (6th Cir.1983), *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); and *Sequoyah v. Tennessee Valley Authority,* 620 F.2d 1159 (6th Cir.1980), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980).

In *Yoder,* the Court found that compulsory school attendance past the age of 14 "contravenes the *basic* religious tenets and practices of the Amish faith." (emphasis added). *Yoder, supra* at 218, 92 S.Ct. at 1534. In *Sherbert,* the Court found that in refusing to work on Saturday, a Seventh-Day Adventist followed a *"cardinal* principal of her religious faith." (emphasis added). *Sherbert* at 406, 83 S.Ct. at 1795. In both of these cases, the Court did note that the belief or practice at odds with a state regulation was one of utmost importance to, or about which their was no disagreement within, the plaintiff's religion.

However, at no point did the Court hold that such a finding must be made in order to prevail on a free exercise claim. Rather, as mentioned above, the concern appears to be simply that the belief or action be rooted in religion. *Accord, Thomas v. Review Board, supra,* at 713, 101 S.Ct. at 1429. That Saturday worship is a "cardinal" principal of the Seventh Day Adventist religion simply makes it easy to find that the belief is religious. No Supreme Court decision has turned on the issue of whether a partic-

ular belief was central to the believer's faith. The two Sixth Circuit cases relied upon by defendants also support the "rooted in religion" standard and do not mandate a judicial determination of the relative doctrinal significance of the beliefs at issue.

In *Lakewood,* the desire to construct a church building on the particular parcel of land zoned residential had absolutely no basis in the congregation's faith. Their religion did not compel them to build a church on that parcel of real estate. Indeed, the court determined that the building of a church, either in the residential district or anywhere else, had no religious or ritualistic significance for the Jehovah's Witnesses. Thus, it is clear that no evaluation was made by the court of the importance of the alleged religious action for which protection was sought. The case turned upon the fact that the act of building a church was not "integrally related" to any underlying religious belief of the plaintiffs.

In *Sequoyah,* certain Cherokee Indians sought to enjoin the flooding of the Little Tennessee River because it would destroy sacred burial grounds which some felt compelled to visit and/or preserve. Although the court stated that the claim of centrality of the land to the practice of the traditional Cherokee religion was missing, 620 F.2d at 1164, the case turned upon the fact that the plaintiffs' objections were based primarily upon a fear that their cultural heritage would suffer if these "sacred" grounds were lost. "The overwhelming concern of the [plaintiffs] appears to be related to the historical beginnings of the Cherokees and their cultural development." *Id.*

The plaintiffs believe that they must not allow their children to be exposed to the content of the Holt series. The Court is of the opinion that it should determine whether this belief is essentially religious and not whether it is a central tenet of the plaintiffs' faith. And this determination should be made despite the fact that many people holding more orthodox religious beliefs might find the plaintiffs' beliefs inconsist-

ent, illogical, incomprehensible, and unacceptable. Based on the stipulations of the parties and the proof offered at trial, therefore, the Court FINDS that the plaintiffs' beliefs are sincerely held religious convictions entitled to protection under the Free Exercise Clause of the First Amendment.

█ The parties have stipulated that the plaintiffs find certain material in the Holt series offensive to their beliefs. Joint Stipulation 55. Testimony at trial reinforced this position. The representative plaintiff-parents clearly testified that the material objected to was offensive "in the context of the Holt series." The plaintiffs perceive certain objectionable themes running throughout the Holt series. For example, the Holt series contains a definite feminist theme,[8] and the plaintiffs have a religious objection to stories which appear to denigrate the differences between the sexes.

It appears to the Court that many of the objectionable passages in the Holt books would be rendered inoffensive, or less offensive, in a more balanced context. The problem with the Holt series, as it relates to the plaintiffs' beliefs, is one of degree. One story reinforces and builds upon the others throughout the individual texts and the series as a whole. The plaintiffs believe that, after reading the entire Holt series, a child might adopt the views of a feminist, a humanist, a pacifist, an anti-Christian, a vegetarian, or an advocate of a "one-world government".

Plaintiffs sincerely believe that the repetitive affirmation of these philosophical viewpoints is repulsive to the Christian faith—so repulsive that they must not allow their children to be exposed to the Holt series. This is their religious belief. They have drawn a line, "and it is not for us to say that the line [they] drew was an unreasonable one." *Thomas, supra,* at 715, 101 S.Ct. at 1430.

Having made these findings, we must determine whether the state's action has burdened plaintiffs' free exercise of their religious beliefs. The applicable test was set forth in *Thomas, supra,* at 717–18, 101 S.Ct. at 1431–32: "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, ... a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."

In *Thomas,* a Jehovah's Witness resigned his employment on religious grounds after his employer transferred him to a department that manufactured armaments. The state denied unemployment compensation benefits. The Supreme Court held that this violated his free exercise rights because it put pressure on the plaintiff to either violate his religious beliefs or forego the otherwise available public benefit.

In *Sherbert,* a Seventh-Day Adventist refused to work on Saturdays because of her religious convictions. Following her discharge, the state denied her unemployment compensation benefits. The Supreme Court, based upon the reasoning subsequently used in *Thomas,* held that this violated her free exercise rights.

In *Spence v. Bailey,* 465 F.2d 797 (6th Cir.1972), a high school student, who had a religiously based conscientious objection to war, refused to attend state required ROTC training.[9] The school refused to award Spence a diploma. The Sixth Circuit held that this violated his free exercise rights "since it compels the conscientious objector either to engage in military training contrary to his religious beliefs, or to give up his public education." *Id.* at 799.

In *Moody v. Cronin,* 484 F.Supp. 270 (C.D.Ill.1979), Pentecostal children refused

---

**8.** There is no question that the reading texts teach more than just how to read.

**9.** The state required every student to take one year of physical education or ROTC. No physi-

cal education classes were offered for males at Spence's high school. He was thus faced with state requirement that he attend ROTC.

to participate in co-educational physical education classes because of their religious objection to exposure to the opposite sex in "immodest attire." The school mandated that they attend these classes "under penalty of suspension, expulsion, denial of credits for graduation, and other discipline." *Id.* at 272. Based upon reasoning like that applied in *Spence,* the district court found that the children's free exercise rights had been violated. *Cf., Grove v. Mead School Dist. No. 354,* 753 F.2d 1528 (9th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985).[10]

On the basis of the foregoing, it seems hardly possible to question the fact that the plaintiffs' free exercise rights have been burdened. Plaintiffs' religious beliefs compel them to refrain from exposure to the Holt series. The Board has effectively required that the student-plaintiffs either read the offensive texts or give up their free public education. This case is clearly in line with *Thomas, Sherbert,* and their progeny. Accordingly, the Court FINDS that the plaintiffs' free exercise rights have been burdened by the school board policy.

"The mere fact that the [plaintiffs'] religious practice is burdened by a governmental program does not mean that an exemption accommodating [their] practice must

be granted. The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas* at 718, 101 S.Ct. at 1432. Whether that burden is impermissible or not will turn on the discussion to follow.

### III.

### STATE INTEREST

■ The state interest implicated in this action is its interest in the education of its young. In order for a state's interest to justify uniform application of a regulation which burdens an individual's free exercise rights, it must be "compelling," *Thomas,* "overriding," *U.S. v. Lee,* 455 U.S. 252, 258, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982), "of the highest order," *Yoder* at 215, 92 S.Ct. at 1533, and "especially important," *Bowen v. Roy,* — U.S. —, —, 106 S.Ct. 2147, 2167, 90 L.Ed.2d 735 (1986) (O'Connor, J. concurring in part and dissenting in part).[11]

No party disputes that the state's interest in education meets these various tests. Providing public schools ranks at the very apex of the function of a state. *Yoder, supra* at 213.

---

**10.** In *Grove,* a student objected on religious grounds to reading *The Learning Tree,* which was assigned in her high school English literature class. Her teacher assigned another book and allowed her to leave the room during discussion of the offensive text. The student and her mother brought suit seeking removal of the book from the school, alleging that it violated the student's free exercise rights as well as the Establishment Clause. Because the school allowed her the option of foregoing exposure to the offensive text, the court found that there was no coercion against her free exercise rights. "Plaintiffs allege that they believe 'eternal consequences' result to them and their children from exposure to *The Learning Tree* or discussion of it. That allegation would probably be sufficient to present a free exercise question if Cassie Grove had been compelled to read the book or be present while it was discussed in class." (Canby, J., concurring at 1541–2).

**11.** Defendants have indicated that in a case such as the present action, challenging the denial of otherwise uniformly provided benefits, a lesser showing of state interest may be required. This

is based upon the Chief Justice's opinion in *Bowen.* Chief Justice Burger's opinion was the opinion of the Court in that case, but it is the majority opinion only so far as parts I and II are concerned. It is in part III that the pronouncements relied upon by the defendants are found. Part III of the opinion finds accord with only two other members of the court. Chief Justice Burger states therein that, when a government regulation "indirectly and incidentally calls for a choice between securing a government benefit and adherence to religious beliefs," *Bowen,* 106 S.Ct. at 2155, "the Government meets its burden when it demonstrates that [the] challenged [regulation] ..., neutral and uniform in application, is a reasonable means of promoting a legitimate public interest." *Id.* 106 S.Ct. at 2156. This Court finds itself in agreement with Justice O'Connor, who notes that the test enunciated by the Chief Justice "has no basis in precedent." (O'Connor, J. concurring in part and dissenting in part 106 S.Ct. at 2166).

However, in the instant case, the state, acting through its local school board, has chosen to further its legitimate and overriding interest in public education by mandating the use of a single basic reading series. The Court has found that compulsory use of this reading series burdens the plaintiffs' free exercise rights. In order to justify this burden, the defendants must show that the state's interest in the education of its children necessitates the uniform use of the Holt reading series—that this uniformity is essential to accomplishing the state's goals. Therefore, the Court must decide whether the state can achieve literacy and good citizenship for all students without forcing them to read the Holt series.

It seems obvious that this question must be answered in the affirmative. The legislative enactments of this state admit as much. Although Tennessee has manifested its compelling interest in education through its compulsory education law, it has, by allowing children to attend private schools or to be taught at home, also acknowledged that its interests may be accomplished in other ways and may yield to the parental interest in a child's upbringing. Moreover, the fact that the state has approved several basic reading series for use in the Tennessee public schools tells us something of the expendability of any particular series.

In insisting upon the necessity of uniformity, the defendants point to legitimate concerns about the difficulty of administering an alternative reading program. The Court agrees that uniformity would make the testing, grading, and teaching of reading more manageable. However, it is clear from the evidence at trial that the state's interest in uniformity is by no means absolute. Many of the expert educators who appeared at trial indicated that teaching is best accomplished through individualized instruction.[12]

The defendants also insist that any accommodation of the plaintiffs is impossible. This position is based, in part, on the plaintiffs' lists of objections to the Holt series. Exhibits 22–37. It is true that many of the plaintiffs' objections suggest that other elements of the curriculum besides the reading program could easily be considered offensive to their beliefs. However, as indicated earlier, it is the Court's perception that the plaintiffs have drawn a line in regard to their religiously mandated action. The Holt series is on one side of the line as intolerable, and apparently the balance of the books and school curriculum remain, at this point, on the other side of the line. The plaintiffs have not made multi-subject, multi-text objections; they have objected to the Holt reading series. The defendants may not justify burdening the plaintiffs' free exercise rights in this narrow case on the basis of what the plaintiffs might find objectionable in the future.

Moreover, proof at trial demonstrated that accommodating the plaintiffs is possible without materially and substantially disrupting the educational process. *See, Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). The students at the middle school were provided with an alternative reading arrangement for a period of several weeks. There was no testimony at trial that those arrangements resulted in any detriment to the student-plaintiffs. In fact, those children still received above average grades for that period. Even after the School Board mandate, compromise arrangements were worked out with some of the plaintiffs.[13]

12. Mrs. Evelyn Rodriguez, who has taught elementary school in Hawkins County for ten or eleven years, testified that she not only divides her reading class into two or three groups by reading level, but that she always uses additional texts and materials other than the basic reader. As much as possible, she works with the students on their individual reading level, particularly if a child is below grade level in reading skills. In addition, children requiring special instruction in reading leave the classroom during the reading period and go to a reading lab.

13. Steve Whittaker was allowed to return to school after the suspensions and continue reading from an alternative book until the first of the year. Thereafter, Steve participated with

A related concern of the defendants is that if plaintiffs are allowed an alternative, the Court will have "opened the floodgates" to a barrage of such requests. The state argues that "[t]o permit individual teachers, students, parents or ministers to choose the textbook of their liking would inescapably result in widespread chaos not only within the Hawkins County School System but also every public school system within the State of Tennessee." [14]

While this is a very legitimate concern, such a scenario seems unlikely to occur. Proof at trial indicated that objections such as those of the plaintiffs have never, to the memory of Hawkins County school officials, been raised in the past. Dr. J. Gordon Melton testified that, although there are a variety of sects in and around Hawkins County, the area is relatively homogeneous from a religious standpoint.[15] Accommodating the beliefs of the small group of students involved in this case probably would not wreak havoc in the school system by initiating a barrage of requests for alternative materials.

While the Court must be sensitive to the widespread implications of its decisions, it must also limit its decisions to the facts of the case before it. *Bender v. Williamsport Area School District,* —— U.S. ——, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). The case before the Court is a narrow one. The plaintiffs are objecting, on religious grounds, to the mandated use of the Holt series in the Hawkins County public schools. The Court has already found that the plaintiffs' sincerely held religious beliefs are burdened by the defendants' requirement. In order for the plaintiffs to be entitled to any judicial relief, the court must also find that no compelling state interest justifies this burden on the plaintiffs and that the state's interests can be served by less restrictive means. The proof at trial overwhelmingly supports such a finding.

Accordingly, the Court FINDS further that, while the State of Tennessee has a compelling and overriding interest in the education of its children and the literacy of its citizens, this interest can be accomplished by less restrictive means. The uniform, compulsory use of the Holt series in the Hawkins County public schools is by no means essential to furthering the state's goals.

### IV.

### INJUNCTIVE RELIEF

■ Given these findings, the Court must now consider the plaintiffs' demand that they be afforded alternative reading texts and the defendants' concern that such relief would violate the Establishment Clause.

Evidence at trial indicated that providing alternative texts would require additional preparation by existing teachers or the hiring of part-time reading tutors. However, it was clear that this accommodation could be achieved without substantially disrupting the education process and without substantially inconveniencing either the plaintiff-students or the rest of the student body. Moreover, such an accommodation might promote a spirit of religious tolerance in the school system and impress upon the student body the high regard this society has for religious freedom.

---

the rest of his class upon the assurance from his teacher "that she wouldn't put emphasis on the stories that were objectionable to us and violated our religious beliefs." TR. at 925. His teacher also wrote notes about some stories on Steve's worksheets such as, "Don't believe what's in the content of this story." *Id.* at 926. The Whitakers could not afford to send Steve to a private school.

Then student-plaintiff Gina Marshall was allowed to return to school after the suspensions without participating in the Holt series. She simply worked on English in the accompanying workbook. Her teacher put an "x" through the portions dealing with stories from the Holt series.

**14.** Pretrial Brief of defendant Robert McElrath, Commissioner of Education of the State of Tennessee, at 9.

**15.** TR. at 1552, 1555. Churches in the area are primarily Protestant.

On the other hand, considerable evidence indicated that no single, secular reading series on the state's approved list would be acceptable to the plaintiffs without modifications. Reading assignments might have to be tailored to the plaintiffs' needs, and the average reading teacher might not readily recognize those portions of the texts which offend the plaintiffs' beliefs. The defendants are rightly concerned that any accommodation of the plaintiffs in the schools would have the effect of advancing a particular religion and would involve an excessive entanglement between the state and religion. *See, Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). It is hard to imagine any reading program for the plaintiffs offered at the schools which would not present Establishment Clause problems.

Under these circumstances, the Court FINDS that a reasonable alternative which could accommodate the plaintiffs' religious beliefs, effectuate the state's interest in education, and avoid Establishment Clause problems, would be to allow the plaintiff-students to opt out of the school district's reading program. The State of Tennessee has provided a complete opt-out, a total curriculum alternative, in its home schooling statute. T.C.A. § 49–6–3050. The Court perceives that this alternative could also work effectively for a single subject. Allowing the student-plaintiffs to opt out of reading class would relieve the school system of any burden that would have been caused by providing alternative teaching arrangements and would relieve the plaintiffs of the burden on their religious freedom. Although it will require extra effort on the part of the plaintiff-parents, these parents have demonstrated their willingness to make such an effort as the price of accommodation in the public school system.

As the Court envisions the opt-out program, each of the student-plaintiffs would withdraw to a study hall or to the library during his or her regular reading period at school and would study reading with a parent later at home. The home schooling portion of the child's education would be proportionally subject to the provisions of the statute. T.C.A. § 49–6–3050(b). The child's reading proficiency would be rated by the standardized achievement tests used by the state. If deficiencies develop, the parents and school officials should confer to facilitate improvement. The Court finds that these children are bright and capable of completing such a program without serious detriment to their reading skills or citizenship. The specifics of this program will best be developed by the professional educators and the parents.

■ The home schooling opt-out does not contravene the Establishment Clause. There is neither state sponsorship, financial support, nor active involvement of the sovereign in religious activity. This holding is in accordance with *Spence, supra,* and *Moody, supra,* which granted similar relief without an Establishment Clause problem.

Accordingly, the defendants are hereby ENJOINED from requiring the student-plaintiffs to read from the Holt series and ORDERED to allow the student-plaintiffs to attend the Hawkins County public schools without participating in the course of reading instruction, as long as the parents submit written notice of their intent to provide home school reading instruction in accordance with T.C.A. § 49–6–3050. During the normal reading period, the student-plaintiffs shall be excused from the classroom and provided with suitable space in the library or elsewhere for a study hall. No student shall be penalized for exercising this option.

This opinion shall not be interpreted to require the school system to make this option available to any other person or to these plaintiffs for any other subject. Further accommodations, if they must be made, will have to be made on a case-by-case basis by the teachers, school administrators, Board, and Department of Education in the exercise of their expertise, and failing that, by the Court.

## V.

## DAMAGES

■ Finally, we turn to the individual defendants' assertion that their good faith

immunity bars the plaintiffs' claim for damages. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The standard for invoking the good faith defense is objective, not subjective.

■ In the case at bar, where Free Exercise rights clash with Establishment Clause protections, considerable doubt existed to whether the defendants' actions violated clearly established constitutional rights. This Court's initial appraisal of the situation was that the constitution did not protect the plaintiffs from exposure to offensive ideas and that the Board was not in violation of the plaintiffs' rights as long as the Holt series was neutral on the subject of religion. While the application of the sequential reasoning required by the Sixth Circuit's on remand has now lead the Court to a different conclusion, the individual defendants cannot be expected to have anticipated this ruling and must be accorded good faith immunity from money damages.

Accordingly, the plaintiffs' claim for damages against defendants Cloud, Bailey, McKee, Elkins, Silvers, Price, Dykes, and Salley is hereby DISMISSED.

The Clerk will notify the parties of the date for a hearing on damages against the Hawkins County Board of Education.

## VI.

### SUMMARY

In summary, the Court has made the following findings of fact and conclusions of law:

(1) The plaintiffs have sincerely held religious beliefs which are entitled to protection under the Free Exercise Clause of the First Amendment and which are offended by certain recurring themes in the Holt series.

(2) In forcing the plaintiff-students to read from the Holt series or to forfeit a free public education, the defendants have burdened the plaintiffs' right of free exercise of their religion.

(3) The State of Tennessee and the Hawkins County Board of Education have a legitimate, compelling, and overriding interest in the education of public school students; but this interest does not necessitate uniform use of the Holt series and can be achieved by less restrictive means.

(4) For this reason, the plaintiffs' civil rights have been violated, and they are entitled to both injunctive relief and money damages.

(5) The defendants cannot accommodate the plaintiffs' needs within the context of the school system without risk of violating the Establishment Clause of the First Amendment.

(6) The plaintiffs are therefore entitled to opt out of the Hawkins County public school reading program while still enjoying the benefit of the rest of the curriculum (with appropriate provisions for home instruction according to state law).

(7) The individual defendants are protected from any financial liability to the plaintiffs on the basis of their qualified good faith immunity.

(8) And finally, the plaintiffs are entitled to a hearing on damages, to be assessed against the Hawkins County School Board, for any harm the plaintiffs may have suffered as a proximate result of the Board's interference with their First Amendment rights.