Titone, J.
(dissenting). I agree with many of the sentiments set forth in the majority opinion, including the majority’s expressed solicitude for plaintiffs’ right to the free exercise of their religious convictions. Further, like the majority, I believe that the unquestionably urgent contemporary goal of preventing the spread of AIDS should not obscure the importance of the more enduring values represented in the Free Exercise Clause of the First Amendment. However, unlike the majority, I have grave doubts about the need for a hearing on plaintiffs’ claims. That disposition is troublesome to me, both because defendants’ conclusory submissions seem insufficient to raise a legally significant question of fact and because, as a practical matter, it is difficult to discern what additional facts a hearing would reveal. Moreover, unlike the majority, I do not believe that this case fits neatly within the "mere exposure” rule, which affords public school authorities wide latitude in requiring attendance at classroom lessons that contain material offensive to some religious sects. Accordingly, I write separately to express my own dissenting views on the issues this case presents.
Initially, it bears emphasis that while questions involving claims for religious exemption are unquestionably fact-sensitive (majority opn, at 124), they are nonetheless governed by the conventional rules for granting or denying summary relief (see, Mozert v Hawkins County Pub. Schools, 765 F2d 75, 78, on remand 647 F Supp 1194, revd 827 F2d 1058, cert denied 484 US 1066). Under these rules, a party opposing summary judgment "must produce evidentiary proof in admissible form sufficient to require a trial of material questions of fact * * * mere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient” (Zuckerman v City of New York, 49 NY2d 557, 562; accord, Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067-1068; Alvord v Swift & Muller Constr. Co., 46 NY2d 276, 281-282). In this *132 case, the majority has identified several questions of fact that, in its view, require a trial. However, as I read the record, defendants’ conclusory submissions do not rise to the level of proof that is required successfully to oppose summary relief.
First, the majority identifies as a triable question of fact whether plaintiffs have truly remained spiritually segregated from the larger community, and therefore insulated from exposure to its evil, as their religion assertedly demands. As the majority observes, plaintiffs have submitted substantial documentation of the manner in which their insularity is preserved, i.e., rules that forbid their children from socializing with others during or after school, interdictions against exposure to television, radio, magazines and the like and rules limiting social intercourse to members of the group. This documentation is sufficient to establish, at least prima facie, the genuineness of plaintiffs’ claim that separation from society and avoidance of exposure to the "details of evil” are essential features of their religious practice.
In opposition to plaintiffs’ claims on this point, defendants have come forward with no specific contradictory facts or proof, in affidavit form, that plaintiffs’ separatist practices are not what they have represented. Instead, defendants merely make note of the fact that plaintiffs are not totally isolated and do have some contact with the larger community through their attendance at school and work. Based upon these "facts,” defendants then ask the court to infer that plaintiffs’ religious exercise would not necessarily be compromised by exposure to the AIDS curriculum.
These submissions leave me to wonder what more would be elicited in an evidentiary hearing. Plaintiffs have not disputed the allegation that they rely on the larger community to supply gainful employment and education for their children. To the contrary, they candidly acknowledge this reliance, explaining it as a practical necessity, which they keep to a minimum because of their religious commitment to separatism. Presumably, defendants have already "laid bare” their proof, as they are required to do when a motion for summary judgment has been made. We may therefore assume that they have no additional proof to offer on this question. We thus have before us all of the facts that are likely to emerge. The conclusion that further proceedings may produce something additional rests on nothing more than mere "expressions of hope” or speculative theorizing of the sort that the case law forbids (e.g., Zuckerman v City of New York, supra, at 562).
*133 Moreover, the majority’s insistence upon further factual development raises troubling questions about the proper fact-finding role of the courts in this dispute. The suggestion that a factual dispute exists concerning the extent of plaintiffs’ actual isolation from the mainstream of society implies questions about either the sincerity with which plaintiffs hold and practice their separatist beliefs or the extent to which their beliefs actually do require the near-complete isolation that their papers allege. Since, as the majority notes (majority opn, at 127), defendants have not questioned the sincerity of plaintiffs’ beliefs and practices, the inquiry will presumably focus on the latter question.
It is difficult to imagine, however, how a court could ever engage in such an inquiry without running directly afoul of the well-established rule that the judiciary may not become the arbiter of what a particular religious group truly believes. As this court stated in Matter of Holy Spirit Assn. v Tax Commn. (55 NY2d 512, 522), "[t]he articulation of the Supreme Court in foreclosing judicial inquiry into the truth or falsity of religious beliefs is equally applicable to judicial inquiry as to the content of religious beliefs.” Thus, "[njeither the courts nor the administrative agencies of the State * * * may go behind the declared content of religious beliefs” (id., at 521). Yet, that is precisely what the majority declares should be done here.
The same infirmity exists in the majority’s statements that there must be an inquiry into whether "the AIDS curriculum poses any threat to the continued existence of the Brethren as a church community.” (Majority opn, at 128.) Plaintiffs have squarely alleged that their religion forbids instruction on matters of morality and physical intimacy other than that given by members of their own community. According to plaintiffs’ submissions, exposure to the matters addressed in the disputed AIDS curriculum "would undermine the foundations of [their] faith * * * and could even jeopardize [the children’s] place in the holy fellowship of God’s Son”. Furthermore, both common sense and an overview of plaintiffs’ submissions suggest that the success of the separatism that is so central to their creed depends upon their ability to shield their children from the larger community’s more permissive values and ideas on matters of sexuality (cf., Wisconsin v Yoder, 406 US 205 [separatist Amish sect sought to avoid exposing its children to the competitive values inculcated in public schools]).
*134 Once again, there is nothing concrete in defendants’ submissions that calls these assertions into question, apart, that is, from some conclusory assertions that plaintiffs’ children would suffer no irreversible harm from exposure to the special AIDS curriculum.[1] Further, even if defendants’ submissions on the issue were not so sparse, a serious question would exist as to what kind of further proof defendants could conceivably muster. Will the trial court be called upon to consider expert testimony concerning the relative importance of various aspects of the Brethren’s separatist views? Will conflicting testimony by coreligionists be accepted, either to refute or explain these plaintiffs’ assertions about the centrality of the religious principle requiring that they remain "simple of the details of evil”? If so, will the court be called upon to decide whose position is most credible, whose views represent the true Brethren faith and, finally, what is the relative hierarchical significance of the Brethren’s various beliefs and practices? How can such an inquiry be conducted consistent with the rule that there is no "right of civil authorities to examine the creed and theology of [a cjhurch and to factor out what in its * * * considered judgment are the peripheral * * * aspects” (Matter of Holy Spirit Assn. v Tax Commn., supra, at 527)? These are all important questions, which the majority, regrettably, leaves unanswered.
Furthermore, I cannot agree that the question of whether there is a "threat to the continued existence” of the sect as a religious community is a legally significant issue precluding summary relief.[2] To be sure, the pages in the Yoder opinion that the majority cites make reference to substantial "inter-fer[ence] with the [child’s] religious development * * * and his *135 integration into the [community’s] way of life,” the "very real threat of undermining the [religious] community * * * and religious practices” and the grave "endanger[ment] if not destruction of] the free exercise of [the litigants’] religious beliefs” (406 US, at 218-219; see also, id., at 209-212, 234-236). But those references were included merely to demonstrate how serious the impact of compulsory State education would be under the particular facts of the case. Nothing in the Yoder opinion suggests that the Free Exercise Clause’s protections are limited to State requirements that threaten the very existence of the religion and/or the religious community. Indeed, if that were the test for invoking the First Amendment’s protective mantle, the State could, for example, require Jewish or Muslim school children whose families observe special religious dietary laws to eat pork-based food products, since such "minor” breaches of those groups’ religious practices could not be said to threaten the vitality of the religious community itself. Plainly, that is not, and cannot be, the law (cf., People v Lewis, 68 NY2d 923 [where State interest may be satisfied in other ways, prisoner may not be required to submit to an act which would "impinge upon” his sincerely held religious beliefs]).
The majority apparently does not disagree in principle, but nonetheless believes that the exacting standard it posits should be applied here because, in its view, plaintiffs’ claim falls within the line of cases denying relief to sects seeking to avoid even the mere exposure to ideas that offend their religious principles (see, majority opn, at 124-125, nn 4 & 5 [and cases cited therein]). Yoder (supra) is then treated in the majority’s analysis as an "exception” to this line of cases (see, majority opn, at 125-126), with all of the rigid, fact-specific limitations that ordinarily accompany exceptions to well-established, well-regarded legal rules. It is this characterization of the issue in the present case, as well as of the significance of the Yoder decision, that lies at the heart of our disagreement.
In my view, neither this case, nor Yoder (supra), is simply an example of a religious sect’s effort to obtain First Amendment protection from the "mere exposure” to inimical ideas. Instead this case, like Yoder (supra), is an attempt by plaintiffs to secure a judicial dispensation from having to perform an affirmative act that their religion forbids. Although the gist of what plaintiffs seek to avoid is, indeed, "exposure” to a certain category of information, plaintiffs are motivated not merely by a desire to steer clear of offensive or contradictory *136 ideas (cf., Mozert v Hawkins County Bd. of Educ., 827 F2d 1058, supra), but rather by a religious precept that requires them, and their children, to remain innocent of "the details of evil.” In a sense, plaintiffs are forbidden by their religious beliefs to eat of the tree of secular knowledge on the subject of AIDS in the same way that some observant Jewish and Muslim individuals are forbidden to eat pork — and in the same way that the Amish individuals in Yoder were forbidden to send their teen-age children to public high school, thereby removing them from the traditional farm community at a time that was critical to their spiritual development (see, 406 US, at 209, 211, 218). Accordingly, plaintiffs are entitled to the same protection, without regard to whether the continuing vitality of their religious community has been threatened.
The final "fact question” that the majority identifies concerns the importance of the State interest that is sought to be vindicated here. In this regard, I agree with the majority that although society’s interest in controlling the spread of AIDS is compelling, it does not necessarily follow that the State’s interest in furnishing widespread AIDS education provides a compelling basis for overriding the religious beliefs of school children’s parents. Where the majority and I differ is, once again, on the questions of the sufficiency of the State’s submissions in opposition to summary judgment and the likelihood that a further hearing will reveal additional, legally relevant facts.
As the majority notes, once the impairment of religious freedom has been established, the State has the burden of showing with "particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption” (Wisconsin v Yoder, supra, at 236). Here, although the State has submitted a substantial amount of background material concerning the need for AIDS education, its submissions do not explain with the necessary specificity why an exemption should not be granted to this small and insular religious group. As in Yoder, the defendants’ observations that Brethren occasionally withdraw from the sect and that outsiders are occasionally invited to join are too speculative to constitute a "compelling” State interest, at least in the absence of some factual showing that such movement between the Brethren and the larger community is statistically significant (see, Wisconsin v Yoder, supra, at 224-225). Furthermore, the State has not introduced facts, in evidentiary form or otherwise, to support its conclusory claim that the moral *137 training which the Brethren routinely provide, coupled with their promise to instruct their children specifically about the AIDS virus (see, majority opn, at 130), are not an adequate substitute for the secular education that the State proposes to provide.
Finally, as a matter of common sense and experience, I have difficulty crediting any claim by the State that its interests would be seriously impaired by granting an exemption to these plaintiffs. As the majority suggests (majority opn, at 128), the statutory and regulatory provisions for granting exemptions on a case-by-case basis belie any potential contention by the State that strict universal AIDS education, without exception, is necessary to satisfy its interests. Moreover, although education is, unfortunately, the most effective weapon we now have against this contemporary plague, we should not lose sight of the fact that knowledge is not the equivalent of a serum that would ensure immunity (see, Matter of Hofbauer, 47 NY2d 648; cf., Jacobson v Massachusetts, 197 US 11). To the contrary, the efficacy of education in this context might well be questioned, since the individuals who are most at risk, such as intravenous drug users, are also among those who are least susceptible to the influence of educators. Furthermore, given the nature of this disease and the manner in which it is spread, it seems clear that prevention depends upon a combination of personal factors, only one of which involves clinical knowledge. Equally critical are such factors as an individual’s choice of life-style and sense of self-esteem — precisely the areas which the Brethren’s moral and spiritual training addresses.
In the final analysis, the continued existence of our pluralistic society depends not only upon our commitment to tolerating minority viewpoints, but also upon our willingness to accommodate them. Further, I believe that we jeopardize an important element of our social structure when we too readily displace the moral and spiritual guidance that may be derived from family and church with the secular and purportedly value-neutral instruction that our public schools are equipped to provide. While I share the abhorrence of ignorance that characterizes much of modern western culture, I cannot overlook the fact that our contemporary faith in the power of secular education has not immunized us from such social ills as rampant drug abuse, an inordinately high drop-out rate, family dissolution and spiritual demoralization, as well as socially transmitted diseases such as AIDS. Accordingly, like *138 the Yoder court (406 US, at 223-224, supra), I am most reluctant to assume that today’s prevailing culture, which places its faith in objective knowledge, is "right” while plaintiffs and others like them, who place their faith in moral and spiritual guidance, are "wrong.”[3]
For these reasons, I would prefer to simply grant plaintiffs’ request for summary judgment and direct defendants to exempt plaintiffs’ children from the AIDS curriculum to which they object. In light of the limited number of individuals involved, the uniqueness of plaintiffs’ sect and the narrowness of the exemption from compulsory education that they seek, I can see no compelling reason to deny them that relief without further litigation. Accordingly, I dissent and vote to reverse by denying defendants’ motion for summary judgment and granting plaintiffs’ summary judgment motion.

. Indeed, during the oral argument in this court, the attorney for defendant school district himself demonstrated the legitimacy of plaintiffs’ concerns when he asserted that an important goal of the AIDS curriculum was to inculcate tolerance and teach children that AIDS victims are not "bad people.” While that message is obviously a correct and worthwhile one, it is plainly inimical to plaintiffs’ core beliefs. In fact, such value-laden instruction based on the beliefs of the surrounding community strikes at the very heart of the isolationist principles upon which plaintiffs’ religious practices are built.

. Although the majority has stopped short of squarely stating that "the law actually requires such extreme injury” (majority opn, at 128), its holding certainly suggests that conclusion, since plaintiffs’ averments on the issue, and defendants’ "steadfast” assertions to the contrary, would not be sufficient to defeat summary judgment unless the issue were deemed legally material to the resolution of the controversy.

. The majority takes issue with this discussion, characterizing it as "misdirected” and "undeservedly critical of the court” (majority opn, at 130, n 6). However, it is not my intention to criticize the values the majority has expressed, most of which I share (see, 131, 136, infra). Rather, I am simply exercising my prerogative — and, indeed, my duty — as an appellate Judge to expose the values and beliefs that underlie my legal position.