827 F.2d 1058
 102 A.L.R.Fed. 497, 56 USLW 2142, 41
Ed. Law Rep. 473
 Bob & Alice MOZERT, individually and as guardians ad litem
for Travis Mozert and Sundee L. Mozert, et al.,
Plaintiffs-Appellees,
v.
HAWKINS COUNTY BOARD OF EDUCATION, (Hawkins County Public
Schools), (86- 6144/87-5024), Defendant-Appellant,
Charles Smith, Commissioner of Education of the State of
Tennessee (86-6179), Intervening Defendant-Appellant,
James Childress; Doug Cloud; Conley E. Bailey; Larry
Elkins; Harold E. Silvers, Jr.; Jean Price;
Quentin Dykes and James Salley
(86-6180), Defendants-Appellants.
 Nos. 86-6144, 86-6179, 86-6180 and 87-5024.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 9, 1987.
Aug. 24, 1987.
Rehearing and Rehearing En Banc Denied Oct. 5, 1987.
 
 Ronald W. Woods, Milligan, Coleman, Fletcher, Gaby, Kilday and Woods, Greeneville, Tenn., N.R. Coleman, Jr., Adrienne Masters, Timothy B. Dyk (argued), Wilmer, Cutler & Pickering, Washington, D.C., Steven A. Schneider, John Payton, Scott D. Godshall, for Hawkins County Bd. of Educ.
 Michael P. Farris (argued), Joy Jowdy, Cimron Campbell, Jordan W. Lorence, Washington, D.C., Larry E. Parrish, Memphis, Tenn., for Concerned Women for America.
 Burke Marshall, Yale Law School, New Haven, Conn., for N.Y. State Education Dept., et al. amicus curiae.
 Robert H. Chanin, Jeremiah A. Collins, L. Hope O'Keefe, Washington, D.C., for Nat. Educ. Assc. amicus curiae.
 Michael W. Catalano, C. Susan Spurgeon, W.J. Michael Cody, William H. Farmer, Atty. Gen.'s Office, Nashville, Tenn., for McElrath.
 Charles Hampton White, Nashville, Tenn., for J. Price and J. Salley.
 W.J. Michael Cody (argued), Atty. Gen. of Tenn., Nashville, Tenn., William H. Farmer, Michael W. Catalano, C. Susan Spurgeon, for Charles Smith.
 Carter G. Phillips, Sidley & Austin, Washington, D.C., for amicus curiae The American Jewish Comm.
 Brian Weiss, New York City, for amicus curiae, Litforum Friends of the First Amendment.
 Douglas Laycock, University of Texas School of Law, Austin, Tex., for amicus curiae Nat. Council for Churches of Christ in the U.S.A.
 Before LIVELY, Chief Judge, KENNEDY and BOGGS, Circuit Judges.
 LIVELY, Chief Judge.
 
 
 1
 This case arose under the Free Exercise Clause of the First Amendment, made applicable to the states by the Fourteenth Amendment. The district court held that a public school requirement that all students in grades one through eight use a prescribed set of reading textbooks violated the constitutional rights of objecting parents and students. The district court entered an injunction which required the schools to excuse objecting students from participating in reading classes where the textbooks are used and awarded the plaintiff parents more than $50,000 damages.
 
 I.
 A.
 
 2
 Early in 1983 the Hawkins County, Tennessee Board of Education adopted the Holt, Rinehart and Winston basic reading series (the Holt series) for use in grades 1-8 of the public schools of the county. In grades 1-4, reading is not taught as a separate subject at a designated time in the school day. Instead, the teachers in these grades use the reading texts throughout the day in conjunction with other subjects. In grades 5-8, reading is taught as a separate subject at a designated time in each class. However, the schools maintain an integrated curriculum which requires that ideas appearing in the reading programs reoccur in other courses. By statute public schools in Tennessee are required to include "character education" in their curricula. The purpose of this requirement is "to help each student develop positive values and to improve student conduct as students learn to act in harmony with their positive values and learn to become good citizens in their school, community, and society." Tennessee Code Annotated (TCA) 49-6-1007 (1986 Supp.).
 
 
 3
 Like many school systems, Hawkins County schools teach "critical reading" as opposed to reading exercises that teach only word and sound recognition. "Critical reading" requires the development of higher order cognitive skills that enable students to evaluate the material they read, to contrast the ideas presented, and to understand complex characters that appear in reading material. Plaintiffs do not dispute that critical reading is an essential skill which their children must develop in order to succeed in other subjects and to function as effective participants in modern society. Nor do the defendants dispute the fact that any reading book will do more than teach a child how to read, since reading is instrumental in a child's total development as an educated person.
 
 
 4
 The plaintiff Vicki Frost is the mother of four children, three of whom were students in Hawkins County public schools in 1983. At the beginning of the 1983-84 school year Mrs. Frost read a story in a daughter's sixth grade reader that involved mental telepathy. Mrs. Frost, who describes herself as a "born again Christian," has a religious objection to any teaching about mental telepathy. Reading further, she found additional themes in the reader to which she had religious objections. After discussing her objections with other parents, Mrs. Frost talked with the principal of Church Hill Middle School and obtained an agreement for an alternative reading program for students whose parents objected to the assigned Holt reader. The students who elected the alternative program left their classrooms during the reading sessions and worked on assignments from an older textbook series in available office or library areas. Other students in two elementary schools were excused from reading the Holt books.
 
 B.
 
 5
 In November 1983 the Hawkins County School Board voted unanimously to eliminate all alternative reading programs and require every student in the public schools to attend classes using the Holt series. Thereafter the plaintiff students refused to read the Holt series or attend reading classes where the series was being used. The children of several of the plaintiffs were suspended for brief periods for this refusal. Most of the plaintiff students were ultimately taught at home, or attended religious schools, or transferred to public schools outside Hawkins County. One student returned to school because his family was unable to afford alternate schooling. Even after the board's order, two students were allowed some accommodation, in that the teacher either excused them from reading the Holt stories, or specifically noted on worksheets that the student was not required to believe the stories.
 
 
 6
 On December 2, 1983, the plaintiffs, consisting of seven families--14 parents and 17 children--filed this action pursuant to 42 U.S.C. Sec. 1983. In their complaint the plaintiffs asserted that they have sincere religious beliefs which are contrary to the values taught or inculcated by the reading textbooks and that it is a violation of the religious beliefs and convictions of the plaintiff students to be required to read the books and a violation of the religious beliefs of the plaintiff parents to permit their children to read the books. The plaintiffs sought to hold the defendants liable because "forcing the student-plaintiffs to read school books which teach or inculcate values in violation of their religious beliefs and convictions is a clear violation of their rights to the free exercise of religion protected by the First and Fourteenth Amendments to the United States Constitution."
 
 C.
 
 7
 The defendants filed a motion to dismiss or, in the alternative, for summary judgment. The district court granted the defendants' motion for summary judgment, concluding that although passages in the reading textbooks might offend sincere religious beliefs of the plaintiffs, the books appeared neutral on the subject of religion and did not violate the plaintiffs' constitutional rights. Mozert v. Hawkins County Public Schools, 582 F.Supp. 201 (E.D.Tenn.1984). On appeal this court reversed and remanded for further proceedings. Mozert v. Hawkins County Public Schools, 765 F.2d 75 (6th Cir.1985). This court concluded that summary judgment was improper because issues of material fact were present. This conclusion was based largely on the fact that the defendants had filed an answer in which they put in issue, either denying categorically, or for lack of information, many of the allegations of the complaint including the basic issues of the sincerity of the plaintiffs' religious beliefs and the burden that use of the Holt series placed upon those beliefs. In remanding, this court stated, "The court expresses no opinion on the merits of the plaintiffs' claims or those of the defendants as we have considered only the procedural posture of the case under Rule 56, Federal Rules of Civil Procedure." Id. at 79.
 
 II.
 A.
 
 8
 Following remand the Commissioner of Education of the State of Tennessee was permitted to intervene as a defendant. At a pretrial hearing the parties made certain stipulations. Counsel for the defendants stipulated that the plaintiffs' religious beliefs are sincere and that certain passages in the reading texts offend those beliefs. However, counsel steadfastly refused to stipulate that the fact that the plaintiffs found the passages offensive made the reading requirement a burden on the plaintiffs' constitutional right to the free exercise of their religion. Similarly, counsel for the plaintiffs stipulated that there was a compelling state interest for the defendants to provide a public education to the children of Hawkins County. However, counsel stipulated only to a narrow definition of the compelling state interest--one that did not involve the exclusive use of a uniform series of textbooks. These stipulations left for trial the issues of whether the plaintiffs could show a burden on their free exercise right, in a constitutional sense, and whether the defendants could show a compelling interest in requiring all students in grades 1-8 of the Hawkins County public schools to use the Holt, Rinehart and Winston basal reading textbooks. These were questions of law to be determined on the basis of evidence produced at trial.
 
 
 9
 The parties also agreed to a bifurcated trial. The court would conduct a bench trial and if an unconstitutional burden were found and no compelling state interest required judgment for the defendants, a separate jury trial would be held to set damages. The parties subsequently entered a joint waiver of the right to trial by jury, and the district court assessed damages and entered judgment accordingly.
 
 B.
 
 10
 Vicki Frost was the first witness for the plaintiffs and she presented the most complete explanation of the plaintiffs' position. The plaintiffs do not belong to a single church or denomination, but all consider themselves born again Christians. Mrs. Frost testified that the word of God as found in the Christian Bible "is the totality of my beliefs." There was evidence that other members of their churches, and even their pastors, do not agree with their position in this case.
 
 
 11
 Mrs. Frost testified that she had spent more than 200 hours reviewing the Holt series and had found numerous passages that offended her religious beliefs. She stated that the offending materials fell into seventeen categories which she listed. These ranged from such familiar concerns of fundamentalist Christians as evolution and "secular humanism" to less familiar themes such as "futuristic supernaturalism," pacifism, magic and false views of death.
 
 
 12
 In her lengthy testimony Mrs. Frost identified passages from stories and poems used in the Holt series that fell into each category. Illustrative is her first category, futuristic supernaturalism, which she defined as teaching "Man As God." Passages that she found offensive described Leonardo da Vinci as the human with a creative mind that "came closest to the divine touch." Similarly, she felt that a passage entitled "Seeing Beneath the Surface" related to an occult theme, by describing the use of imagination as a vehicle for seeing things not discernible through our physical eyes. She interpreted a poem, "Look at Anything," as presenting the idea that by using imagination a child can become part of anything and thus understand it better. Mrs. Frost testified that it is an "occult practice" for children to use imagination beyond the limitation of scriptural authority. She testified that the story that alerted her to the problem with the reading series fell into the category of futuristic supernaturalism. Entitled "A Visit to Mars," the story portrays thought transfer and telepathy in such a way that "it could be considered a scientific concept," according to this witness. This theme appears in the testimony of several witnesses, i.e., the materials objected to "could" be interpreted in a manner repugnant to their religious beliefs.
 
 
 13
 Mrs. Frost described objectionable passages from other categories in much the same way. Describing evolution as a teaching that there is no God, she identified 24 passages that she considered to have evolution as a theme. She admitted that the textbooks contained a disclaimer that evolution is a theory, not a proven scientific fact. Nevertheless, she felt that references to evolution were so pervasive and presented in such a factual manner as to render the disclaimer meaningless. After describing her objection to passages that encourage children to make moral judgments about whether it is right or wrong to kill animals, the witness stated, "I thought they would be learning to read, to have good English and grammar, and to be able to do other subject work." Asked by plaintiffs' attorney to define her objection to the text books, Mrs. Frost replied:
 
 
 14
 Very basically, I object to the Holt, Rhinehart [sic] Winston series as a whole, what the message is as a whole. There are some contents which are objectionable by themselves, but my most withstanding [sic] objection would be to the series as a whole.
 
 
 15
 Another witness for the plaintiffs was Bob Mozert, father of a middle school and an elementary school student in the Hawkins County system. His testimony echoed that of Vicki Frost in large part, though his answers to questions tended to be much less expansive. He also found objectionable passages in the readers that dealt with magic, role reversal or role elimination, particularly biographical material about women who have been recognized for achievements outside their homes, and emphasis on one world or a planetary society. Both witnesses testified under cross-examination that the plaintiff parents objected to passages that expose their children to other forms of religion and to the feelings, attitudes and values of other students that contradict the plaintiffs' religious views without a statement that the other views are incorrect and that the plaintiffs' views are the correct ones.
 
 C.
 
 16
 The district court held that the plaintiffs' free exercise rights have been burdened because their "religious beliefs compel them to refrain from exposure to the Holt series," and the defendant school board "has effectively required that the student plaintiffs either read the offensive texts or give up their free public education." Mozert v. Hawkins County Public Schools, 647 F.Supp. 1194, 1200 (E.D.Tenn.1986), (emphasis added). In reaching this conclusion the district court analogized the plaintiffs' position to that of a sabbatarian who was denied unemployment compensation benefits for refusing to work on Saturdays, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), a Jehovah's Witness who was denied unemployment compensation benefits after quitting a job that required him to work on military tanks, Thomas v. Review Board, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and a conscientious objector who refused to participate in ROTC training, Spence v. Bailey, 465 F.2d 797 (6th Cir.1972).
 
 
 17
 The district court went on to find that the state had a compelling interest "in the education of its young," 647 F.Supp. at 1200, but that it had erred in choosing "to further its legitimate and overriding interest in public education by mandating the use of a single basic reading series," id. at 1201, in the face of the plaintiffs' religious objections. The court concluded that the proof at trial demonstrated that the defendants could accommodate the plaintiffs without material and substantial disruption to the educational process by permitting the objecting students to "opt out of the school district's reading program," id. at 1203, and meet the reading requirements by home schooling. Tennessee's school attendance statute requires parents to cause their children between the ages of 7 and 16 to attend either a public or non-public school. "Non-public school" is defined to mean "a church-related school, a private school or a home school." TCA 49-6-3001. Although the statute appears to contemplate that a student will attend one or the other of the three approved types of school, the district court apparently believed that a partial opt-out would be consistent with the statutory scheme.
 
 
 18
 The court entered an injunction prohibiting the defendants "from requiring the student-plaintiffs to read from the Holt series," and ordering the defendants to excuse the student plaintiffs from their classrooms "[d]uring the normal reading period" and to provide them with suitable space in the library or elsewhere for a study hall. 647 F.Supp. at 1203. The Court also dismissed the individual school board members as defendants on qualified immunity grounds and ordered a hearing on damages against the Hawkins County Board of Education. Id. at 1204. This hearing was held on December 15, 1983, following which the court awarded damages to the plaintiffs in the total amount of $51,531, largely to reimburse the plaintiff families for the costs of sending their children to alternate schools and the costs of pursuing this lawsuit.
 
 III.
 A.
 
 19
 The first question to be decided is whether a governmental requirement that a person be exposed to ideas he or she finds objectionable on religious grounds constitutes a burden on the free exercise of that person's religion as forbidden by the First Amendment. This is precisely the way the superintendent of the Hawkins County schools framed the issue in an affidavit filed early in this litigation. In his affidavit the superintendent set forth the school system's interest in a uniformity of reading texts. The affidavit also countered the claims of the plaintiffs that the schools were inculcating values and religious doctrines contrary to their religious beliefs, stating: "Without expressing an opinion as to the plaintiffs' religious beliefs, I am of the opinion that plaintiffs misunderstand the fact that exposure to something does not constitute teaching, indoctrination, opposition or promotion of the things exposed. While it is true that these textbooks expose the student to varying values and religious backgrounds, neither the textbooks nor the teachers teach, indoctrinate, oppose or promote any particular value or religion." That the district court accepted the issue as thus framed is clear from its reference to "exposure to the Holt series."
 
 
 20
 It is also clear that exposure to objectionable material is what the plaintiffs objected to albeit they emphasize the repeated nature of the exposure. The complaint mentioned only the textbooks that the students were required to read. It did not seek relief from any method of teaching the material and did not mention the teachers' editions. The plaintiffs did not produce a single student or teacher to testify that any student was ever required to affirm his or her belief or disbelief in any idea or practice mentioned in the various stories and passages contained in the Holt series. However, the plaintiffs appeared to assume that materials clearly presented as poetry, fiction and even "make-believe" in the Holt series were presented as facts which the students were required to believe. Nothing in the record supports this assumption.
 
 
 21
 At numerous places in her testimony Vicki Frost referred to various exercises and suggestions in the teachers' manuals as support for her view that objectionable ideas were being inculcated as truth rather than being offered as examples of the variety of approaches possible to a particular question. However, the students were not required to read the teachers' materials. While these materials suggested various ways of presenting the lessons, including "acting out" and round table discussions, there was no proof that any plaintiff student was ever called upon to say or do anything that required the student to affirm or deny a religious belief or to engage or refrain from engaging in any act either required or forbidden by the student's religious convictions. Mrs. Frost seemed to assume that each teacher used every suggested exercise or teaching tool in the teachers' editions. There was evidence that reading aloud and acting out the themes encountered in school lessons help young people learn. One of the teachers stated that students read some of the stories aloud. Proof that an objecting student was required to participate beyond reading and discussing assigned materials, or was disciplined for disputing assigned materials, might well implicate the Free Exercise Clause because the element of compulsion would then be present. But this was not the case either as pled or proved. The record leaves no doubt that the district court correctly viewed this case as one involving exposure to repugnant ideas and themes as presented by the Holt series.
 
 
 22
 Vicki Frost testified that an occasional reference to role reversal, pacifism, rebellion against parents, one-world government and other objectionable concepts would be acceptable, but she felt it was the repeated references to such subjects that created the burden. The district court suggested that it was a matter of balance, id. at 1199, apparently believing that a reading series that presented ideas with which the plaintiffs agree in juxtaposition to those with which they disagree would pass constitutional muster. While balanced textbooks are certainly desirable, there would be serious difficulties with trying to cure the omissions in the Holt series, as plaintiffs and their expert witnesses view the texts.
 
 
 23
 However, the plaintiffs' own testimony casts serious doubt on their claim that a more balanced presentation would satisfy their religious views. Mrs. Frost testified that it would be acceptable for the schools to teach her children about other philosophies and religions, but if the practices of other religions were described in detail, or if the philosophy was "profound" in that it expressed a world view that deeply undermined her religious beliefs, then her children "would have to be instructed to [the] error [of the other philosophy]." It is clear that to the plaintiffs there is but one acceptable view--the Biblical view, as they interpret the Bible. Furthermore, the plaintiffs view every human situation and decision, whether related to personal belief and conduct or to public policy and programs, from a theological or religious perspective. Mrs. Frost testified that many political issues have theological roots and that there would be "no way" certain themes could be presented without violating her religious beliefs. She identified such themes as evolution, false supernaturalism, feminism, telepathy and magic as matters that could not be presented in any way without offending her beliefs. The only way to avoid conflict with the plaintiffs' beliefs in these sensitive areas would be to eliminate all references to the subjects so identified. However, the Supreme Court has clearly held that it violates the Establishment Clause to tailor a public school's curriculum to satisfy the principles or prohibitions of any religion. Epperson v. Arkansas, 393 U.S. 97, 106, 89 S.Ct. 266, 271, 21 L.Ed.2d 228 (1968).
 
 
 24
 The testimony of the plaintiffs' expert witness, Dr. Vitz, illustrates the pitfalls of trying to achieve a balance of materials concerning religion in a reading course. He found "markedly little reference to religion, particularly Christianity, and also remarkably little to Judaism" in the Holt series. His solution would be to "beef up" the references to these two dominant religions in the United States. However, an adherent to a less widely professed religion might then object to the slighting of his or her faith. Balance in the treatment of religion lies in the eye of the beholder. Efforts to achieve the particular "balance" desired by any individual or group by the addition or deletion of religious material would lead to a forbidden entanglement of the public schools in religious matters, if done with the purpose or primary effect of advancing or inhibiting religion. Epperson, 393 U.S. at 107, 89 S.Ct. at 272; Abington School District v. Schempp, 374 U.S. 203 at 222, 83 S.Ct. 1560 at 1571, 10 L.Ed.2d 844 (1963).
 
 B.
 
 25
 In this case the district court erroneously applied decisions based on governmental requirements that objecting parties make some affirmation or take some action that offends their religious beliefs. In Sherbert the burden on the plaintiff's right of free exercise consisted of a governmental requirement that she either work on her Sabbath Day or forfeit her right to benefits. Similarly, in Thomas the plaintiff was denied a benefit for refusing to engage in the production of armaments. In each case the burden on the plaintiff's free exercise of religion consisted of being required to perform an act which violated the plaintiffs' religious convictions or forego benefits. Ms. Sherbert was not merely exposed to the view that others in the work force had no religious scruples against working on Saturdays and Mr. Thomas was not merely exposed to government publications designed to encourage employees to produce armaments. In each case there was compulsion to do an act that violated the plaintiffs' religious convictions. In Hobbie v. Unemployment Appeals Commission of Florida, --- U.S. ----, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987), the Supreme Court reaffirmed its holdings in Sherbert and Thomas, emphasizing that in both cases there was compulsion either to do an act that was prohibited by the plaintiff's religion or to modify his or her behavior and violate religious beliefs. In Spence this court upheld a conscientious objector's right not to be required to participate in his high school's ROTC program. The court found that Spence's claim resembled Sherbert's "since it compels the conscientious objector either to engage in military training contrary to his religious beliefs, or to give up his public education." 465 F.2d at 799. It is clear that it was being compelled to engage in military training, not being exposed to the fact that others do so, that was found to be an unconstitutional burden.
 
 
 26
 In Sherbert, Thomas and Hobbie there was governmental compulsion to engage in conduct that violated the plaintiffs' religious convictions. That element is missing in the present case. The requirement that students read the assigned materials and attend reading classes, in the absence of a showing that this participation entailed affirmation or denial of a religious belief, or performance or non-performance of a religious exercise or practice, does not place an unconstitutional burden on the students' free exercise of religion.
 
 C.
 
 27
 In addition to the cases cited by the district court, the plaintiffs, in this court, have relied particularly upon three Supreme Court decisions. We find them all distinguishable.
 
 
 28
 The issue in Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), was whether a state could deny public office to a person solely because of the person's refusal to declare a belief in God. Quoting from its earlier decision in Everson v. Board of Education, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947), the Court stated:
 
 
 29
 We repeat and reaffirm that neither a State nor the Federal Government can constitutionally force a person "to profess a belief or disbelief in any religion."
 
 
 30
 Id. at 495, 81 S.Ct. at 1683. Since there was no evidence that the plaintiff students were ever required to profess or deny a religious belief the issue in Torcaso simply is not presented by the instant case.
 
 
 31
 Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), grew out of a school board rule that required all schools to make a salute to the flag and a pledge of allegiance a regular part of their daily program. All teachers and students were required to participate in the exercise and refusal to engage in the salute was considered an act of insubordination which could lead to expulsion and possible delinquency charges for being unlawfully absent. The plaintiff was a Jehovah's Witness who considered the flag an "image" which the Bible forbids worshiping in any way. Justice Jackson, writing for the Court, stated:
 
 
 32
 Here, ... we are dealing with a compulsion of students to declare a belief. They are not merely made acquainted with the flag salute so that they may be informed as to what it is or even what it means.
 
 
 33
 Id. at 631, 63 S.Ct. at 1182. Further, explaining the basis of the decision, Justice Jackson wrote:
 
 
 34
 Here it is the State that employs a flag as a symbol of adherence to government as presently organized. It requires the individual to communicate by word and sign his acceptance of the political ideas it thus bespeaks.
 
 
 35
 * * *
 
 
 36
 * * *
 
 
 37
 It is also to be noted that the compulsory flag salute and pledge requires affirmation of a belief and attitude of mind.
 
 
 38
 Id. at 633, 63 S.Ct. at 1183. It is abundantly clear that the exposure to materials in the Holt series did not compel the plaintiffs to "declare a belief," "communicate by word and sign [their] acceptance" of the ideas presented, or make an "affirmation of a belief and an attitude of mind." In Barnette the unconstitutional burden consisted of compulsion either to do an act that violated the plaintiff's religious convictions or communicate an acceptance of a particular idea or affirm a belief. No similar compulsion exists in the present case.
 
 
 39
 It is clear that governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion, is the evil prohibited by the Free Exercise Clause. In Abington School District v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963), the Court described the Free Exercise Clause as follows:
 
 
 40
 Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion. The distinction between the two clauses is apparent--a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended.
 
 
 41
 See also Engel v. Vitale, 370 U.S. 421, 430, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962) ("The Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion....")
 
 
 42
 The plaintiffs appear to contend that the element of compulsion was supplied by the requirement of class participation in the reading exercises. As we have pointed out earlier, there is no proof in the record that any plaintiff student was required to engage in role play, make up magic chants, read aloud or engage in the activity of haggling. In fact, the Director of Education for the State of Tennessee testified that most teachers do not adhere to the suggestions in the teachers' manuals and a teacher for 11 years in the Hawkins County system stated that she looks at the lesson plans in the teachers' editions, but "does her own thing." Being exposed to other students performing these acts might be offensive to the plaintiffs, but it does not constitute the compulsion described in the Supreme Court cases, where the objector was required to affirm or deny a religious belief or engage or refrain from engaging in a practice contrary to sincerely held religious beliefs.D.
 
 
 43
 The third Supreme Court decision relied upon by the plaintiffs is the only one that might be read to support the proposition that requiring mere exposure to materials that offend one's religious beliefs creates an unconstitutional burden on the free exercise of religion. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). However, Yoder rested on such a singular set of facts that we do not believe it can be held to announce a general rule that exposure without compulsion to act, believe, affirm or deny creates an unconstitutional burden. The plaintiff parents in Yoder were Old Order Amish and members of the Conservative Amish Mennonite Church, who objected to their children being required to attend either public or private schools beyond the eighth grade. Wisconsin school attendance law required them to cause their children to attend school until they reached the age of 16. Unlike the plaintiffs in the present case, the parents in Yoder did not want their children to attend any high school or be exposed to any part of a high school curriculum. The Old Order Amish and the Conservative Amish Mennonites separate themselves from the world and avoid assimilation into society, and attempt to shield their children from all worldly influences. The Supreme Court found from the record that--
 
 
 44
 [C]ompulsory school attendance to age 16 for Amish children carries with it a very real threat to undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region.
 
 
 45
 Id. at 218, 92 S.Ct. at 1534 (footnote omitted).
 
 
 46
 As if to emphasize the narrowness of its holding because of the unique 300 year history of the Old Amish Order, the Court wrote:
 
 
 47
 It is one thing to say that compulsory education for a year or two beyond the eighth grade may be necessary when its goal is the preparation of the child for life in modern society as the majority live, but it is quite another if the goal of education be viewed as the preparation of the child for life in the separated agrarian community that is the keystone of the Amish faith.
 
 
 48
 Id. at 222, 92 S.Ct. at 1536 (citation omitted). This statement points up dramatically the difference between Yoder and the present case. The parents in Yoder were required to send their children to some school that prepared them for life in the outside world, or face official sanctions. The parents in the present case want their children to acquire all the skills required to live in modern society. They also want to have them excused from exposure to some ideas they find offensive. Tennessee offers two options to accommodate this latter desire. The plaintiff parents can either send their children to church schools or private schools, as many of them have done, or teach them at home. Tennessee law prohibits any state interference in the education process of church schools:
 
 
 49
 The state board of education and local boards of education are prohibited from regulating the selection of faculty or textbooks or the establishment of a curriculum in church-related schools.
 
 
 50
 TCA 49-50-801(b). Similarly the statute permitting home schooling by parents or other teachers prescribes nothing with respect to curriculum or the content of class work.
 
 
 51
 Yoder was decided in large part on the impossibility of reconciling the goals of public education with the religious requirement of the Amish that their children be prepared for life in a separated community. As the Court noted, the requirement of school attendance to age 16 posed a "very real threat of undermining the Amish community and religious practice as they exist today...." 406 U.S. at 218, 92 S.Ct. at 1534. No such threat exists in the present case, and Tennessee's school attendance laws offer several options to those parents who want their children to have the benefit of an education which prepares for life in the modern world without being exposed to ideas which offend their religious beliefs.E.
 
 
 52
 At oral argument plaintiffs' counsel identified Grove v. Mead School Dist. No. 354, 753 F.2d 1528 (9th Cir.1985), cert. denied, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1986), as a decision which strongly supports the plaintiffs' position. In Grove a student and her mother objected to being required to read one book assigned in an English literature class. The student was permitted to read a different book and to leave the classroom during discussion of the book she found offensive; however, she chose to remain during the discussion. The mother brought suit to require the school board to remove the book from the required reading list based on her religious objections to its content. The court of appeals affirmed summary judgment for the school board. In a concurring opinion Judge Canby wrote that plaintiffs' allegation that they believe that "eternal religious consequences" would result to the parents and children from exposure to the offending book "would probably be sufficient to present a free exercise question" if the student had been required to read the book or remain in the classroom while it was being discussed. Id. at 1541-42 (emphasis added). This observation in dicta must be considered in context. The court of appeals in Grove was considering a case where summary judgment had been granted, much as this court considered the present case on the first appeal. Judge Canby did not state that the plaintiff had established a case of burden on the free exercise of religion; he stated only that if she had been required to read the book and remain in class she "probably" would have presented a free exercise question.
 
 
 53
 While relying on this somewhat speculative observation, the plaintiffs failed to note other positive statements in the same concurring opinion that, while addressing a different issue, are at odds with their theories:
 
 
 54
 Were the free exercise clause violated whenever governmental activity is offensive to or at variance with sincerely held religious precepts, virtually no governmental program would be constitutionally possible.
 
 
 55
 Id. at 1542.
 
 
 56
 The lesson is clear: governmental actions that merely offend or cast doubt on religious beliefs do not on that account violate free exercise. An actual burden on the profession or exercise of religion is required.
 
 
 57
 In short, distinctions must be drawn between those governmental actions that actually interfere with the exercise of religion, and those that merely require or result in exposure to attitudes and outlooks at odds with perspectives prompted by religion.
 
 
 58
 Id. at 1543 (citation omitted). These statements echo similar ones in the majority opinion, e.g.,
 
 
 59
 To establish a violation of that clause [Free Exercise], a litigant must show that challenged state action has a coercive effect that operates against a litigant's practice of his or her religion.
 
 
 60
 Id. at 1533 (emphasis added).
 
 IV.
 A.
 
 61
 The Supreme Court has recently affirmed that public schools serve the purpose of teaching fundamental values "essential to a democratic society." These values "include tolerance of divergent political and religious views" while taking into account "consideration of the sensibilities of others." Bethel School Dist. No. 403 v. Fraser, --- U.S. ----, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). The Court has noted with apparent approval the view of some educators who see public schools as an "assimilative force" that brings together "diverse and conflicting elements" in our society "on a broad but common ground." Ambach v. Norwick, 441 U.S. 68, 77, 99 S.Ct. 1589, 1595, 60 L.Ed.2d 49 (1979), citing works of J. Dewey, N. Edwards and H. Richey. The critical reading approach furthers these goals. Mrs. Frost stated specifically that she objected to stories that develop "a religious tolerance that all religions are merely different roads to God." Stating that the plaintiffs reject this concept, presented as a recipe for an ideal world citizen, Mrs. Frost said, "We cannot be tolerant in that we accept other religious views on an equal basis with ours." While probably not an uncommon view of true believers in any religion, this statement graphically illustrates what is lacking in the plaintiffs' case.
 
 
 62
 The "tolerance of divergent ... religious views" referred to by the Supreme Court is a civil tolerance, not a religious one. It does not require a person to accept any other religion as the equal of the one to which that person adheres. It merely requires a recognition that in a pluralistic society we must "live and let live." If the Hawkins County schools had required the plaintiff students either to believe or say they believe that "all religions are merely different roads to God," this would be a different case. No instrument of government can, consistent with the Free Exercise Clause, require such a belief or affirmation. However, there was absolutely no showing that the defendant school board sought to do this; indeed, the school board agreed at oral argument that it could not constitutionally do so. Instead, the record in this case discloses an effort by the school board to offer a reading curriculum designed to acquaint students with a multitude of ideas and concepts, though not in proportions the plaintiffs would like. While many of the passages deal with ethical issues, on the surface at least, they appear to us to contain no religious or anti-religious messages. Because the plaintiffs perceive every teaching that goes beyond the "three Rs" as inculcating religious ideas, they admit that any value-laden reading curriculum that did not affirm the truth of their beliefs would offend their religious convictions.
 
 
 63
 Although it is not clear that the plaintiffs object to all critical reading, Mrs. Frost did testify that she did not want her children to make critical judgments and exercise choices in areas where the Bible provides the answer. There is no evidence that any child in the Hawkins County schools was required to make such judgments. It was a goal of the school system to encourage this exercise, but nowhere was it shown that it was required. When asked to comment on a reading assignment, a student would be free to give the Biblical interpretation of the material or to interpret it from a different value base. The only conduct compelled by the defendants was reading and discussing the material in the Holt series, and hearing other students' interpretations of those materials. This is the exposure to which the plaintiffs objected. What is absent from this case is the critical element of compulsion to affirm or deny a religious belief or to engage or refrain from engaging in a practice forbidden or required in the exercise of a plaintiff's religion.
 
 B.
 
 64
 In McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Supreme Court held invalid a practice which permitted weekly religious instruction for consenting pupils in public school classrooms. Those students who did not choose to participate were required to leave their regular classrooms and go to another part of the school building to continue their secular studies. Although McCollum involved the Establishment Clause, the several opinions discussed both religion clauses at some length. In his concurring opinion Justice Jackson emphasized that some compulsion to perform a religiously prohibited ritual or make a religiously prohibited affirmation is essential to a claim of infringement of the free exercise rights of students in public schools. Noting the large number of separate religious bodies existing in the United States, he wrote:
 
 
 65
 If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits.
 
 
 66
 Id. at 235, 68 S.Ct. at 477. The fact that schools might be subjected to constant law suits is certainly not determinative. However, the Supreme Court has cautioned that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint." Epperson, 393 U.S. at 104, 89 S.Ct. at 270. When asked to "interpose," courts must examine the record very carefully to make certain that a constitutional violation has occurred before they order changes in an educational program adopted by duly chosen local authorities.
 
 
 67
 Quite recently the Supreme Court quoted Justice Douglas, concurring in Sherbert v. Verner, 374 U.S. at 412, 83 S.Ct. at 1798, as follows:
 
 
 68
 [T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government.
 
 
 69
 Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 2152, 90 L.Ed.2d 735 (1986). Paraphrasing this thought, the Court wrote:
 
 
 70
 The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.
 
 
 71
 Id. Since we have found none of the prohibited forms of governmental compulsion in this case, we conclude that the plaintiffs failed to establish the existence of an unconstitutional burden. Having determined that no burden was shown, we do not reach the issue of the defendants' compelling interest in requiring a uniform reading series or the question, raised by the defendant, of whether awarding damages violated the Establishment Clause.
 
 
 72
 Judge Boggs concludes that the majority reverses the district court because it found the plaintiffs' claims of First Amendment protection so extreme as obviously to violate the Establishment Clause. This is not the holding of the majority. We do point out that under certain circumstances the plaintiffs, by their own testimony, would only accept accommodations that would violate the Establishment Clause. However, this is not the holding. What we do hold is that the requirement that public school students study a basal reader series chosen by the school authorities does not create an unconstitutional burden under the Free Exercise Clause when the students are not required to affirm or deny a belief or engage or refrain from engaging in a practice prohibited or required by their religion. There was no evidence that the conduct required of the students was forbidden by their religion. Rather, the witnesses testified that reading the Holt series "could" or "might" lead the students to come to conclusions that were contrary to teachings of their and their parents' religious beliefs. This is not sufficient to establish an unconstitutional burden.
 
 
 73
 Judge Boggs also implies that the majority distorts the record and decides the case on a basis different from that upon which the plaintiffs proceeded. This would be a valid criticism if we were reviewing a judgment on the pleadings. However, as Judge Boggs notes, this case was decided following a full trial. The plaintiffs did not confine themselves to the language of their complaint, but testified expansively with respect to the claims and issues before the court. We have decided the case that was actually tried, as permitted by Rule 15(b), Fed.R.Civ.P.
 
 
 74
 The judgment of the district court granting injunctive relief and damages is reversed, and the case is remanded with directions to dismiss the complaint. No costs are allowed. The parties will bear their own costs on appeal.
 
 
 75
 CORNELIA G. KENNEDY, Circuit Judge, concurring.
 
 
 76
 I agree with Chief Judge Lively's analysis and concur in his opinion. However, even if I were to conclude that requiring the use of the Holt series or another similar series constituted a burden on appellees' free exercise rights, I would find the burden justified by a compelling state interest.
 
 
 77
 Appellants have stated that a principal educational objective is to teach the students how to think critically about complex and controversial subjects and to develop their own ideas and make judgments about these subjects. Several witnesses testified that the only way to achieve these objectives is to have the children read a basal reader, participate in class discussions, and formulate and express their own ideas and opinions about the materials presented in a basal reader. Thus, appellee students are required to read stories in the Holt series, make personal judgments about the validity of the stories, and to discuss why certain characters in the stories did what they did, or their values and whether those values were proper. Appellee parents testified that they object to their children reading the Holt readers, being exposed to controversial ideas in the classroom, and to their children making critical judgments and formulating their own ideas about anything for which they believe the Bible states a rule or position.[1]
 
 
 78
 In Bethel School Dist. No. 403 v. Fraser, --- U.S. ----, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986), the Supreme Court stated: "The role and purpose of the American public school system was well described by two historians, saying 'public education must prepare pupils for citizenship in the Republic.' " Additionally, the Bethel School Court stated that the state through its public schools must "inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." Id. (quoting C. Beard & M. Beard, New Basic History of the United States 228 (1968)).[2] Teaching students about complex and controversial social and moral issues is just as essential for preparing public school students for citizenship and self-government as inculcating in the students the habits and manners of civility.
 
 
 79
 The evidence at trial demonstrated that mandatory participation in reading classes using the Holt series or some similar readers is essential to accomplish this compelling interest and that this interest could not be achieved any other way. Several witnesses for appellants testified that in order to develop critical reading skills, and therefore achieve appellants' objectives, the students must read and discuss complex, morally and socially difficult issues. Many of these necessarily will be subjects on which appellees believe the Bible states the rule or correct position. Consequently, accommodating appellees' beliefs would unduly interfere with the fulfillment of the appellants' objectives. Cf. United States v. Lee, 455 U.S. 252, 260, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982). Additionally, mandatory participation in the reading program is the least restrictive means of achieving appellants' objectives. Appellees' objections would arise even if the School Board selected another basal reading textbook series since the students would be required to engage in critical reading and form their own opinions and judgments on many of the same issues.
 
 
 80
 The state and the Hawkins County School Board also have a compelling interest in avoiding disruption in the classroom. Hawkins County Schools utilize an integrated curriculum, designed to prepare students for life in a complex, pluralistic society, that reinforces skills and values taught in one subject in other areas. The Director of Elementary Education testified that teachers use every opportunity within the school day to reinforce information taught in the different subject areas. For example, the students may discuss stories in the Holt readers dealing with evolution or conservation of natural resources in the science course. This approach to learning is well-recognized and enables the students to see learning "as part of their total life, not just [as] bits and pieces." Taylor at 1270-71. This is particularly true in grades one through four where reading is taught throughout the school day, rather than in a particular period. Appellants would be unable to utilize effectively the critical reading teaching method and accommodate appellees' religious beliefs. If the opt-out remedy were implemented, teachers in all grades would have to either avoid the students discussing objectionable material contained in the Holt readers in non-reading classes or dismiss appellee students from class whenever such material is discussed. To do this the teachers would have to determine what is objectionable to appellees. This would either require that appellees review all teaching materials or that all teachers review appellees' extensive testimony. If the teachers concluded certain material fell in the objectionable classification but nonetheless considered it appropriate to have the students discuss this material, they would have to dismiss appellee students from these classes.[3] The dismissal of appellee students from the classes would result in substantial disruption to the public schools.
 
 
 81
 Additionally, Hawkins County Public Schools have a compelling interest in avoiding religious divisiveness. The Supreme Court has emphasized that the avoidance of religious divisiveness is nowhere more important than in public education, for "[t]he government's activities in this area can have a magnified impact on impressionable young minds...." Grand Rapids School Dist. v. Ball, 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985). The opt-out remedy would permit appellee students to be released from a core subject every day because of their religion. Thus, although some students in the Hawkins County schools are presently released from class during the school day for special instruction, these students are not released because they have a religious objection to material being presented to the class. The present case is distinguishable from this Court's decision in Spence v. Bailey, 465 F.2d 797 (6th Cir.1972), inasmuch as the student in Spence was permitted to not participate in the school's R.O.T.C. program, a non-core subject. There is less divisiveness in excusing someone from military training then in excusing them from discussing a multitude of ideas. Accordingly, the opt-out remedy ordered by the court is inconsistent with the public schools' compelling interest in "promoting cohesion among a heterogenous democratic people." Illinois ex rel. McCollum v. Board of Educ., 333 U.S. 203, 216, 68 S.Ct. 461, 468, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring).
 
 
 82
 The divisiveness and disruption caused by the opt-out remedy would be magnified if the schools had to grant other exemptions. Although the District Court found that no other objections to the Hawkins County public school curriculum have been raised and that Hawkins County is homogeneous from a religious perspective, this case would create a precedent for persons from other religions to request exemptions from core subjects because of religious objections.[4] If the school district were required to accommodate exceptions and permit other students to opt-out of the reading program and other core courses with materials others found objectionable, this would result in a public school system impossible to administer. As Justice Jackson stated in McCollum, every parent:
 
 
 83
 has as good a right as this plaintiff to demand that the courts compel the schools to sift out of their teaching everything inconsistent with its doctrines. If we are to eliminate everything that is objectionable to any of these warring sects or inconsistent with any of their doctrines, we will leave public education in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits.
 
 
 84
 333 U.S. at 235, 68 S.Ct. at 477.
 
 
 85
 Accordingly, I also would reverse the judgment of the District Court for these additional reasons, as well as the reasons so well stated by Chief Judge Lively.
 
 
 86
 BOGGS, Circuit Judge, concurring.
 
 
 87
 I concur with my colleagues that Hawkins County is not required by the Constitution to allow plaintiffs the latitude they seek in the educational program of these children. However, I reach that result on a somewhat different view of the facts and governing principles here. It seems that the court's opinion rests first on the view that plaintiffs' objection is to any exposure to contrary ideas, and that no one's religious exercise can be burdened simply by compelled exposure, ante, at 1063-64. Second, the opinion rests on the view that no burden can exist here because plaintiffs were not compelled to engage in any conduct prohibited by, or refrain from any practice required by, their religious beliefs, ante at 1064, 1069-70.
 
 
 88
 I do not believe these attempted distinctions will survive analysis. If the situation of these children is not a burden on their religious exercise, it must be because of a principle applicable to all religious objectors to public school curricula. Thus, I believe a deeper issue is present here, is implicitly decided in the court's opinion, and should be addressed openly. The school board recognizes no limitation on its power to require any curriculum, no matter how offensive or one-sided, and to expel those who will not study it, so long as it does not violate the Establishment Clause. Our opinion today confirms that right, and I would like to make plain my reasons for taking that position.
 
 
 89
 * Preliminarily, as my colleagues indicate, we make no judgment on the educational, political or social soundness of the school board's decision to adopt this particular set of books and this general curricular approach. This is not a case about fundamentalist Christians or any particular set of beliefs.[1] It is about the constitutional limits on the powers of school boards to prescribe a curriculum. For myself, I approach this case with a profound sense of sadness. At the classroom level, the pupils and teachers in these schools had in most cases reached a working accommodation. Only by the decisions of higher levels of political authority, and by more conceptualized presentations of the plaintiffs' positions, have we reached the point where we must decide these harsh questions today. The school board faced what must have seemed a prickly and difficult group of parents, however dedicated to their children's welfare. In a similar situation, the poet Edwin Markham described a solution:
 
 
 90
 He drew a circle that shut me out--
 
 
 91
 Heretic, Rebel, a thing to flout.
 
 But Love and I had the wit to win:
 We drew a circle that took him in![2]
 
 92
 As this case now reaches us, the school board rejects any effort to reach out and take in these children and their concerns. At oral argument, the board specifically argued that it was better for both plaintiffs' children and other children that they not be in the public schools, despite the children's obvious desire to obtain some of the benefits of public schooling. Though the board recognized that their allegedly compelling interests in shaping the education of Tennessee children could not be served at all if they drove the children from the school, the board felt it better not to be associated with any hybrid program.
 
 
 93
 Plaintiffs' requests were unusual, but a variety of accommodations in fact were made, with no evidence whatsoever of bad effects. Given the masses of speculative testimony as to the hypothetical future evils of accommodating plaintiffs in any way, had there been any evidence of bad effects from what actually occurred, the board would surely have presented it. As we ultimately decide here, on the present state of constitutional law, the school board is indeed entitled to say, "my way or the highway." But in my view the school board's decision here is certainly not required by the Establishment Clause.[3]
 
 II
 
 94
 Returning to the treatment of plaintiffs' free exercise claim, I believe this is a more difficult case than outlined in the court's opinion. I disagree with the first proposition in the court's opinion, that plaintiffs object to any exposure to any contrary idea. I do not believe we can define for plaintiffs their belief as to what is religiously forbidden to be so comprehensive, where both they and the district court have spoken to the contrary. A reasonable reading of plaintiffs' testimony shows they object to the overall effect of the Holt series, not simply to any exposure to any idea opposing theirs. The district court specifically found that the objection was to exposure to the Holt series, not to any single story or idea. 647 F.Supp. at 1199.
 
 
 95
 Ultimately, I think we must address plaintiffs' claims as they actually impact their lives: it is their belief that they should not take a course of study which, on balance, to them, denigrates and opposes their religion, and which the state is compelling them to take on pain of forfeiting all other benefits of public education.
 
 
 96
 Their view may seem silly or wrong-headed to some, but it is a sincerely held religious belief. By focussing narrowly on references that make plaintiffs appear so extreme that they could never be accommodated, the court simply leaves resolution of the underlying issues here to another case, when we have plaintiffs with a more sophisticated understanding of our own and Supreme Court precedent, and a more careful and articulate presentation of their own beliefs.
 
 
 97
 Under the court's assessment of the facts, this is a most uninteresting case. It is not the test case sought, or feared, by either side. The court reviews the record and finds that the plaintiffs actually want a school system that affirmatively teaches the correctness of their religion, and prevents other students from mentioning contrary ideas. If that is indeed the case, then it can be very simply resolved. It would obviously violate the Establishment Clause for any school system to agree with such an extravagant view.
 
 
 98
 It should be noted and emphasized that if such is the holding, this decision is largely irrelevant to the national legal controversy over this case. The extent to which school systems may constitutionally require students to use educational materials that are objectionable, contrary to, or forbidden by their religious beliefs is a serious and important issue. The question of exactly how terms such as "contrary," "objectionable," and "forbidden," are to be assessed in the context of religious beliefs is a subtle and interesting one. But this decision, as I understand it, addresses none of those questions. When a case arises with more sophisticated or cagey plaintiffs, or less skillful cross-examination, that true issue must be faced anew, with little guidance from this decision. Since these plaintiffs' claims are rejected because they are read to be so extreme as obviously to violate the Establishment Clause, this case is no precedent for the more specific and narrowly drawn complaint that the district court and plaintiffs' counsel (and, to me, the plaintiffs) thought the plaintiffs were making.
 
 
 99
 I find the court's conclusion based on its reading of the record to be unsatisfactory on the factual basis of what was said at the trial. The trial strategies of the two sides were clear. The plaintiffs understood that the more thoroughgoing and extensive their objections, the less possible would it be to accommodate them within the bounds of the Constitution. Therefore, the plaintiffs repeatedly stated their objections in terms of the overall Holt series.
 
 
 100
 The defendants equally clearly sought to depict plaintiffs' objections in the most constitutionally offensive terms. By skillful cross-examination, they did elicit on some occasions the statements on which the court relies. I believe these two lines of apparently contradictory testimony can be reconciled by recognizing the different meanings or usage of the same words or phrases such as "objectionable," "want," or "opposed to." These words can cover a gamut from mild objection or desire to constitutional insistence. Something may be "objectionable," in the sense that one would rather it did not happen, but it is something that must be endured. Conversely, it may be "objectionable" in the sense that it should not be permitted or one should not be required to endure it. Thus, I may find Muzak on buses, or in-flight movies, "objectionable," but that's life.[4] However, one might find the display of pornographic material in either location "objectionable" to the point that a relatively captive audience legally should not be subjected to it.
 
 
 101
 Similarly, plaintiffs may "want" a school system tailored exactly to their religious beliefs (that is why many people choose religious education), but they very well know that that is constitutionally impermissible. They "want" a particular type of accommodation that they have sought in this law suit, and they believe that they are constitutionally entitled to that. Judge Hull, who sat through eight days of trial testimony over these very issues, came to the same conclusion I do, expressed it in the form of a finding, and should not be overturned unless that finding is clearly erroneous. In my reading of the testimony, the judge's finding is not only not clearly erroneous, but it can only be reversed by a failure to recognize a distinction between the ideal education the parents want, and that level of accommodation and education which they believe is constitutionally required and which they "want" here. Thus, I believe we must take plaintiffs' claims as they have stated them--that they desire the accommodation of an opt-out, or alternative reading books, and no more. That is all they have ever asked for in their pleadings, in the arguments at trial and in appellate briefing and argument.
 
 III
 
 102
 I also disagree with the court's view that there can be no burden here because there is no requirement of conduct contrary to religious belief. That view both slights plaintiffs' honest beliefs that studying the full Holt series would be conduct contrary to their religion, and overlooks other Supreme Court Free Exercise cases which view "conduct" that may offend religious exercise at least as broadly as do plaintiffs.
 
 
 103
 On the question of exposure to, or use of, books as conduct, we may recall the Roman Catholic Church's, "Index Librorum Prohibitorum." This was a list of those books the reading of which was a mortal sin, at least until the second Vatican Council in 1962.[5] I would hardly think it can be contended that a school requirement that a student engage in an act (the reading of the book) which would specifically be a mortal sin under the teaching of a major organized religion would be other than "conduct prohibited by religion," even by the court's fairly restrictive standard. Yet, in what constitutionally important way can the situation here be said to differ from that? Certainly, a religion's size or formality of hierarchy cannot determine the religiosity of beliefs. Similarly, and analogous to our case, church doctrine before 1962 also indicated that portions of the banned books could be used or read in a context to show their error, and that references to, or small portions of, the books did not fall under the same ban.[6] Again, it seems inconceivable that we would determine that a Catholic child had forfeited the right to object to committing a mortal sin by reading Hobbes because he was willing, in another context, to read small portions or excerpts of the same material.
 
 
 104
 While this argument would seem persuasive that studying objectionable material would be "conduct" contrary to religious belief, the court's opinion attempts to distinguish our case from Thomas v. Review Board, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), by emphasizing that the plaintiff there was asked to "engage in a practice" forbidden by his religion, and the plaintiffs here are not. I do not believe that distinction bears up under scrutiny. Thomas had to hook up chains to a conveyor in a factory. For Thomas, there was no commandment against hooking up chains. He asserted that this would be "aiding in the manufacture of items used in the advancement of war," because it was in a tank turret line, but he had also said that he would work in a steel factory that might ultimately sell to the military. (A fellow Witness was willing to work in the turret line.) 450 U.S. at 711, n. 4, 715, 101 S.Ct. at 1428, n. 4, 1430. This distinction appears as convoluted as plaintiffs' distinctions seem to some. Nevertheless, Thomas drew his line, and the Supreme Court respected it and dealt with it. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Id. at 714, 101 S.Ct. at 1430.
 
 
 105
 Here, plaintiffs have drawn their line as to what required school activities, what courses of study, do and do not offend their beliefs to the point of prohibition. I would hold that if they are forced over that line, they are "engaging in conduct" forbidden by their religion. The court's excellent summary of its holding on this point, ante, at 1070, appears to concede that what plaintiffs were doing in school was conduct, but that there "was no evidence that the conduct required of the students was forbidden by their religion." I cannot agree. The plaintiffs provided voluminous testimony of the conflict (in their view) between reading the Holt readers and their religious beliefs, including extensive Scriptural references. The district court found that "plaintiffs' religious beliefs compel them to refrain from exposure to the Holt series." 647 F.Supp. at 1200 (emphasis supplied). I would think it could hardly be clearer that they believe their religion commands, not merely suggests, their course of action.
 
 
 106
 If plaintiffs did not use the exact words "reading these books is forbidden by our religion," they certainly seemed to me to make that point clearly. The court's summary also re-emphasizes my point, supra, at 1074-75, that the importance of this holding would be greatly diminished in a future case where plaintiffs can articulate the right set of words.
 
 IV
 
 107
 I have given considerable thought to Judge Kennedy's opinion discussing the importance of the state's interest in "critical reading" and noting the plaintiffs' objection to such instruction. I conclude that the requirement of "critical reading," as accomplished in Tennessee, does not constitute a burden on the free exercise of religion for these plaintiffs separate from the required studying of the Holt books.
 
 
 108
 The most difficult case would be if the state were teaching "critical reading" in the sense that plaintiffs were told to believe (or were downgraded for not believing) that values comes from within oneself, rather than from an external religious source. If this were the case, I think it clear that such teaching would violate the Establishment Clause. Thus, if a pupil upon confronting one of the "moral dilemma" stories in the Holt series were to respond, "I believe you should do x because that's what the Bible tells us to do," the school may not attempt to argue the pupil out of it, or downgrade the pupil for not undertaking a supposedly "more sophisticated" analysis.
 
 
 109
 I do not understand Tennessee to be arguing to the contrary. Tennessee's representatives' own statements of what they are doing is somewhat muddled. The affidavit of County Superintendent Snodgrass says that the schools do not teach "any particular value" and that the schools "teach and promote reading, not values." On the other hand, other statements of the state's position emphasized the values which are being taught. Defendants' expert on the teaching of reading, Dr. Farr, indicates that the author of the series wants students "to use their own value systems to respond" to the materials, with no indication that there would be any downgrading for using value systems that are religious.
 
 
 110
 Whether or not Tennessee insists on students responding to literature based only on self-centered values, I disagree with the idea that such a teaching of "critical reading" would constitute a compelling state interest which entitles the school board to deny plaintiffs the accommodation they seek. Ante, at 1070-71. The school board argues that "critical reading" is something so special that in the words of Farr, "it would be almost impossible to [teach critical reading consistent with the plaintiffs' religious objections]." This notion seems difficult to support. The simple answer to such a claim would seem to be the type of testing which is mandated for all non-public school students in Tennessee. Plaintiffs are quite confident of their ability to pass any consistent tests propounded by the state. Perhaps because of these facts, the state seems unwilling to rest its claims of educational damage on any such tests, and expounds a particularly slippery standard for "critical reading." In particular, when Farr is asked (on direct examination, by the school board's own attorney) if plaintiffs' children, who are getting good grades, must be learning what the state wants them to, he replies, "It's very difficult to measure evaluative and critical reading.... It would be very difficult to know that if that youngster is making adequate progress."
 
 
 111
 It seems to me to be extremely difficult, not to say unfair, to rest a compelling state interest on the asserted failure of plaintiffs to learn something which defendants are apparently unable to define and unwilling to test for. Mr. Justice Stewart has been unfairly derided as propounding an obscenity test of, "I know it when I see it," Jacobellis v. Ohio, 378 U.S. 184, 187, 84 S.Ct. 1676, 1677, 12 L.Ed.2d 793 (1964), but it appears that the school board here seeks that kind of test for critical reading. Their view seems to be that if we are teaching it in the state classrooms, critical reading must be happening, but if plaintiffs are learning reading outside that class (and testing as well as, or better than, the average state student), it must not be happening. I cannot agree with any such analysis of the state's interest in "critical reading."[7]
 
 
 112
 In any event, the test for a compelling interest is quite strict, and requires far more than this or other speculations on possible future evils. To be compelling, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963), quoting Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430. See Hobbie v. Unemployment Comm., --- U.S. ----, 107 S.Ct. 1046, 1049-50, 94 L.Ed.2d 190 (1987); Thomas, 450 U.S. at 718-19, 101 S.Ct. at 1432. In the absence of any testimony as to actual problems from the accommodation that was provided, it is difficult to see how this standard could be met, if a constitutional burden were established.
 
 V
 
 113
 Thus, I believe the plaintiffs' objection is to the Holt series as a whole, and that being forced to study the books is "conduct" contrary to their beliefs. In the absence of a narrower basis that can withstand scrutiny, we must address the hard issues presented by this case: (1) whether compelling this conduct forbidden by plaintiffs' beliefs places a burden on their free exercise of their religion, in the sense of earlier Supreme Court holdings; and (2) whether within the context of the public schools, teaching material which offends a person's religious beliefs, but does not violate the Establishment Clause, can be a burden on free exercise.
 
 
 114
 Determining whether the school board's action places a substantial burden on the plaintiff's free exercise of their religion requires a determination of the scope of the religious beliefs or practices protected by the Free Exercise Clause. Although the Supreme Court has shied away from attempting to define religion, the past forty years has witnessed an expansion of the court's understanding of religious belief. The concept of religion has shifted from a fairly narrow traditional theism, Davis v. Beason, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890); United States v. Macintosh, 283 U.S. 605, 633-34, 51 S.Ct. 570, 578, 75 L.Ed. 1302 (1931) (Hughes, C.J., dissenting), overruled, Girouard v. United States, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), to a broader concept providing protection for the views of unorthodox and nontheistic faiths, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 658-59, 63 S.Ct. 1178, 1194-95, 87 L.Ed. 1628 (1943); Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 1683, 6 L.Ed.2d 982 (1961); United States v. Seeger, 380 U.S. 163, 166, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965); Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970). This expanded definition has been praised by many commentators, who argue for a definition of religion in the Free Exercise Clause that would protect practices based on an individual's belief system involving matters of ultimate concern, Note, Toward a Constitutional Definition of Religion, 91 Harv.L.Rev. 1056, 1072-75 (1978). Others support an interpretation which would provide protection for all beliefs that are "arguably religious." L. Tribe, American Constitutional Law Sec. 14-6, at 828 (1978). The plaintiffs here have no problem fitting within any of the Court's various definitions of religion, as no one contends that their basic beliefs are not religious.
 
 
 115
 However, determining that plaintiffs' beliefs are religious does not automatically mean that all practices or observances springing from those beliefs are entitled to the same amount of protection under the Free Exercise Clause. At one point, the Court made a distinction between religious beliefs and actions, indicating that the government could never interfere with belief or opinion, but could always regulate practices. United States v. Reynolds, 98 U.S. (8 Otto) 145, 166, 25 L.Ed. 244 (1878). This distinction did not hold, as the Court has provided protection for such religious conduct as soliciting contributions, Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), and of course, observing one's chosen Sabbath, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), or refusing to work on armaments. Thomas v. Review Board, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).
 
 
 116
 There remains the question of which religious conduct may not be burdened (and thus must be accommodated unless a compelling interest justifies it), by government action. One theory would draw the line between actions that are compelled or dictated by religious belief and those that are merely motivated or influenced by these beliefs. "Not all actions are necessarily required (duties) or forbidden (sins); religion addresses what is 'better' as well as what is 'good.' " M. McConnell, Accommodation of Religion, [1985] S.Ct.Rev. 1, 27 (discussing permissive rather than mandatory accommodation).
 
 
 117
 The most expansive view of the Free Exercise Clause would be to scrutinize any governmental burden on any activity that is arguably religious and require a balancing test between the government's interest and the burden on the activity. However, the Supreme Court has never gone so far, especially in the context of the public schools. The court has continued to struggle with the questions of which religious actions are protected and how significant the burden on that activity must be in order to trigger the strict scrutiny of the Free Exercise Clause. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), held that the state's compulsory schooling requirement unduly burdened the free exercise of the religious beliefs of the Old Order Amish. The Court stressed that the Amish mode of life was "essential," "fundamental," and "central" to their religious beliefs and that their religious community would be gravely endangered if not destroyed by the state requirement. Id. at 218-19, 92 S.Ct. at 1534-35. While Yoder did not rest on Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and was decided before Thomas, its language is considerably less expansive as to the exercise that should not be burdened than are those cases.
 
 
 118
 For me, the key fact is that the Court has almost never interfered with the prerogative of school boards to set curricula, based on free exercise claims. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), may be the only case, and even there a specific affirmation was required, implicating a non-religious First Amendment basis, as well.
 
 
 119
 From a common sense view of the word "burden," Sherbert and Thomas are very strong cases for plaintiffs. In any sensible meaning of a burden, the burden in our case is greater than in Thomas or Sherbert. Both of these cases involved workers who wanted unemployment compensation because they gave up jobs based on their religious beliefs. Their actual losses that the Court made good, the actual burden that the Court lifted, was one or two thousand dollars at most. Although this amount of money was certainly important to them, the Court did not give them their jobs back. The Court did not guarantee they would get any future job. It only provided them access to a sum of money equally with those who quit work for other "good cause" reasons.
 
 
 120
 Here, the burden is many years of education, being required to study books that, in plaintiffs' view, systematically undervalue, contradict and ignore their religion. I trust it is not simply because I am chronologically somewhat closer than my colleagues to the status of the students involved here that I interpret the choice forced upon the plaintiffs here as a "burden."
 
 VI
 
 121
 However, constitutional adjudication, especially for a lower court, is not simply a matter of common sense use of words. We must determine whether the common sense burden on plaintiffs' religious belief is, in the context of a public school curriculum, a constitutional "burden" on their religious beliefs.
 
 
 122
 I do not support an extension by this court of the principles of Sherbert and Thomas to cover this case, even though there is a much stronger economic compulsion exercised by public schooling than by any unemployment compensation system. I think the constitutional basis for those cases is sufficiently thin that they should not be extended blindly. The exercise there was of a narrow sort, and did not explicitly implicate the purposes or methods of the program itself.
 
 
 123
 Running a public school system of today's magnitude is quite a different proposition. A constitutional challenge to the content of instruction (as opposed to participation in ritual such as magic chants, or prayers)[8] is a challenge to the notion of a politically-controlled school system. Imposing on school boards the delicate task of satisfying the "compelling interest" test to justify failure to accommodate pupils is a significant step.[9] It is a substantial imposition on the schools to require them to justify each instance of not dealing with students' individual, religiously compelled, objections (as opposed to permitting a local, rough and ready, adjustment),[10] and I do not see that the Supreme Court has authorized us to make such a requirement.
 
 
 124
 Our interpretation of these key phrases of our Bill of Rights in the school context is certainly complicated by the fact that the drafters of the Bill of Rights never contemplated a school system that would be the most pervasive benefit of citizenship for many, yet which would be very difficult to avoid. See, e.g., Jernigan v. State, 412 So.2d 1242 (Ala.1982), for the criminal conviction of Catholic parents who lived too far from a Catholic school, and thus did not send their child to school.
 
 
 125
 The average public expenditure for a pupil in Hawkins County is about 20% of the income of the average household there. Even the modest tuition in the religious schools which some plaintiffs attended here amounted to about a doubling of the state and local tax burden of the average resident.[11] Had the Founders recognized the possibility of state intervention of this magnitude, they might have written differently. However, it is difficult for me to see that the words "free exercise of religion," at the adoption of the Bill of Rights, implied a freedom from state teaching, even of offensive material, when some alternative was legally permissible.[12]
 
 
 126
 Therefore, I reluctantly conclude that under the Supreme Court's decisions as we have them, school boards may set curricula bounded only by the Establishment Clause, as the state contends. Thus, contrary to the analogy plaintiffs suggest, pupils may indeed be expelled if they will not read from the King James Bible, so long as it is only used as literature, and not taught as religious truth. See Abington School Dist. v. Schempp, 374 U.S. 203, 224-25, 83 S.Ct. 1560, 1572-73, 10 L.Ed.2d 844 (1963); Donahoe v. Richards, 38 Me. 379, 61 Am.Dec. 256 (1854). Contrary to the position of amicus American Jewish Committee, Jewish students may not assert a burden on their religion if their reading materials overwhelmingly provide a negative view of Jews or factual or historical issues important to Jews, so long as such materials do not assert any propositions as religious truth, or do not otherwise violate the Establishment Clause.
 
 
 127
 The court's opinion well illustrates the distinction between the goals and values that states may try to impose and those they cannot, by distinguishing between teaching civil toleration of other religions, and teaching religious toleration of other religions, ante, at 1069. It is an accepted part of public schools to teach the former, and plaintiffs do not quarrel with that. Thus, the state may teach that all religions have the same civil and political rights, and must be dealt with civilly in civil society. The state itself concedes it may not do the latter. It may not teach as truth that the religions of others are just as correct as religions as plaintiffs' own.
 
 
 128
 It is a more difficult question when, as here, the state presents materials that plaintiffs sincerely believe preach religious toleration of religions by consistent omission of plaintiffs' religion and favorable presentation of opposing views.[13] Our holding requires plaintiffs to put up with what they perceive as an unbalanced public school curriculum, so long as the curriculum does not violate the Establishment Clause. Every other sect or type of religious belief is bound by the same requirement. The rule here is not a rule just for fundamentalist dissenters, for surely the rule cannot be that when the school authorities disagree with non-fundamentalist dissenters, the school loses (See, e.g., Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), Spence v. Bailey, 465 F.2d 797 (6th Cir.1972); Edwards v. Aguilard, --- U.S. ----, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1986)), and when the school authorities disagree with fundamentalists, the school wins (See, e.g., Mozert; Grove v. Mead School Dist., 753 F.2d 1528 (9th Cir.1985); Wright v. Houston Ind. School District, 366 F.Supp. 1208 (S.D.Tex.1972)). Rather, unless the Supreme Court chooses to extend the principle of Thomas to schools, the democratic principle must prevail.[14]
 
 
 129
 Schools are very important, and some public schools offend some people deeply. That is one major reason private schools of many denominations--fundamentalist, Lutheran, Jewish--are growing.[15] But a response to that phenomenon is a political decision for the schools to make. I believe that such a significant change in school law and expansion in the religious liberties of pupils and parents should come only from Supreme Court itself, and not simply from our interpretation. It may well be that we would have a better society if children and parents were not put to the hard choice posed by this case. But our mandate is limited to carrying out the commands of the Constitution and the Supreme Court.
 
 
 130
 I therefore concur in the result and reverse the judgment of the District Court.
 
 
 
 [1]
 Appellee parents have indicated that they would not object to much of the material in the Holt readers if it were balanced by material supporting their religious beliefs. To the extent they assert a burden from the omission of material, I question how an omission can constitute a burden
 
 
 [2]
 Last term the Court recognized that public school officials have considerable discretion in structuring their curriculum to achieve these results. Edwards v. Aguillard, --- U.S. ----, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). In Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Court recognized that "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with a legislative policy." Id. at 475, 97 S.Ct. at 2383 (footnote omitted). The Maher Court acknowledged its decision in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), where the Court upheld a parent's right to have his child taught a particular foreign language, and in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), where it upheld a parent's right to send his child to private school. Nevertheless, the Court stated:
 neither case denied to a State the policy choice of encouraging the preferred course of action. Indeed, in Meyer, the Court was careful to state that the power of the State "to prescribe a curriculum" that included English and excluded German in its free public schools "is not questioned." Similarly, Pierce casts no shadow over a State's power to favor public education by funding it--a policy choice pursued in some States for more than a century.
 432 U.S. at 476-77, 97 S.Ct. at 2384.
 
 
 [3]
 It is important to note that with respect to some of appellees' objections, any required discussion of objectionable materials would violate appellees' religious beliefs. It is not the mere "unbalanced treatment" of these materials that appellees find offensive
 
 
 [4]
 In United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), the Court, in an unanimous opinion, considered whether imposition of Social Security taxes on the Amish violated the free exercise clause because the Amish contended that it was against their religious beliefs to receive public insurance benefits and pay into public insurance funds. Although finding that participation in the program burdened the free exercise of their religion, the Court concluded that participation in the program was essential to accomplish the overriding governmental interest. Id. at 257-58, 102 S.Ct. at 1055. The Court emphasized that mandatory participation in the social security system was indispensable to the vitality of the system, and if participation were voluntary, it would undermine the effectiveness of the program. Additionally, the Court stated that the social security system could not accommodate exceptions that could arise from a large number of religious beliefs. Id. at 260, 102 S.Ct. at 1056
 
 
 [1]
 I note that the amicus brief of the American Jewish Committee and other religious leaders agrees with plaintiffs on two points critical to, and rejected by, the court's opinion. First, that "the compelled use of a reading curriculum can burden Free Exercise Rights." Second, that "the school board's response to appellees' claims burdened their rights."
 
 
 [2]
 E. Markham, "Outwitted," in Best Loved Poems of the American People, p. 67 (Garden City, 1957)
 
 
 [3]
 A different situation would be presented if the purpose or primary effect of any accommodation were to be the advancement of plaintiffs' religion. Ante, at 1065. I see no evidence of such purpose or effect from the accommodation in this case
 
 
 [4]
 See Pub. Util. Comm. of D.C. v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952)
 
 
 [5]
 New Catholic Encyclopedia, Vol. 7, pp. 434-35; Vol. 2, pp. 699-701 (McGraw-Hill, 1967)
 
 
 [6]
 R.A. Burke, What is the Index, pp. 33, 58-9, 88 (Milwaukee, 1952)
 
 
 [7]
 At times, the school board's position recalls the scene in a modern classic, where a little girl entering first grade is told: "Now you tell your father not to teach you any more. It's best to begin reading with a fresh mind. You tell him I'll take over from here and try to undo the damage--." Discussing this later with her older brother, she is told that it's "a new way of teaching. [Teacher] learned about it in college. It'll be in all the grades soon.... It's the Dewey Decimal System." H. Lee, To Kill a Mockingbird, pp. 22-23 (Warner Books, 1982)
 
 
 [8]
 I agree with the court's opinion that it would be unconstitutional to force students to participate in what is, for them, a religious ritual contrary to their beliefs. Ante, at 1064
 
 
 [9]
 I do not think there is any evidence that actually accommodating pupils in practice need be as difficult as the state contends. Indeed, the state espouses a theory of rigidity (and finds alleged experts to support it) that seems a bit ludicrous in this age of individualized attention to many kinds of student language and interest. There was no evidence of actual confusion or disruption from the accommodation that did take place
 
 
 [10]
 In a dispute in Panama City, Florida, teachers of a "critical reading" approach specifically allowed students to opt-out of reading allegedly offensive books in English class. There the opt-out was a way to try to get the school board and objecting parents to allow the use of the books the teachers favored. Washington Post, January 4, 1987, Magazine section at pp. 10, 13-14
 
 
 [11]
 See City and County Data Book, p. 515-16 (GPO, 1983); Statistical Abstract of United States, table 215 (GPO, 107th ed. 1987)
 
 
 [12]
 As guaranteed by the Supreme Court's decision in Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)
 
 
 [13]
 For example, they noted that of 47 stories referring to, or growing out of, religions (including Islam, Buddhism, American Indian religion and nature worship), only 3 were Christian, and none Protestant. A competing reader even bowdlerized the word "God" out of I.B. Singer's intensely religious stories. New York Times, August 2, 1987, Education Life, pp. 20-21
 
 
 [14]
 Plaintiffs are, of course, free to work politically and by education to change the school curriculum, just as others worked and succeeded in making the changes to which plaintiffs object
 
 
 [15]
 See B. Cooper, The Changing Demography of Private Schools, in 16 Education and Urban Society, 429-42 (Sage Publ.1984) (Between 1965 and 1983, enrollment in Lutheran schools grew 35%; in Jewish schools 37%; in non-religious private schools 69% and in all non-Catholic private schools over 130%, National Center for Educational Statistics (1983)); Charles Glenn (Massachusetts Director of Equal Educational Opportunity), Phi Delta Kappan, Feb. 1987, p. 452; U.S. Department of Education, Digest of Education Statistics, pp. 47-48